David D. Lawrence, Esq. [State Bar No. 123039]
E-Mail: dlawrence@lbaclaw.com
Christina M. Sprenger, Esq. [State Bar No. 205105]
E-Mail: csprenger@lbaclaw.com
Daniel S. Cha, Esq. [State Bar No. 260256]
E-Mail: dcha@lbaclaw.com
LAWRENCE BEACH ALLEN & CHOI, PC
1600 North Broadway, Suite 1010
Santa Ana, California 92706
Telephone No. (714) 479-0180
Facsimile No.  (714) 479-0181

Attorneys for Defendants,
COUNTY OF ORANGE, SEAN HILLIARD, JAMES FOUSTE, JARRETT
KURIMAY, DAVID HERNANDEZ, CYRIL FOSTER, MANUEL GARCIA,
MICHAEL PADILLA, IRA ESSOE, MARK HERGESHEIMER, MARK
KUNAR, MATTHEW PRINCE and MICHAEL CARONA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA RASHID RADWAN,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF ORANGE , MICHAEL CARONA, JAMES FOUSTE, SEAN HILLIARD, MATTHEW PRINCE, MARK KUNAR, MARK HERGESHEIMER, IRA ESSOE, MICHAEL PADILLA, MANUEL GARCIA, CYRIL FOSTER, THOMAS STREETER, DAVID HERNANDEZ, JARRETT KURIMAY and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. SACV 08-00786 AG (ANx)<br><br>**DEFENDANTS JAMES FOUSTE'S, SEAN HILLIARD'S, MATTHEW PRINCE'S, MARK KUNAR'S, MARK HERGESHEIMER'S, IRA ESSOE'S, MICHAEL PADILLA'S, MANUEL GARCIA'S, CYRIL FOSTER'S, DAVID HERNANDEZ'S, AND JARRETT KURIMAY'S SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION**<br><br>Hearing:<br>Date:   March 29, 2010<br>Time: 10:00 a.m.<br>Crtrm.: 10D<br><br>Discovery Cut-Off:  2/22/10<br>Pre-Trial Conference:  5/3/10<br>Trial Date: 5/18/10<br><br>*[Individual Defendants' Notice Of Motion And Motion For Summary Judgment/Summary Adjudication; Declarations In Support of Defendants'* |

*Motion For Summary Judgment/Summary Adjudication With Exhibits Attached In Support Thereof; Notice Of Manual Filing; Notice Of Lodging Exhibits "A-B"; Exhibits "E-G" And Exhibit "J" In Support Of Defendants' Motion For Summary Judgment/Summary Adjudication, Individual Defendants' [Proposed] Judgment, filed concurrently herewith]*

**MATTER FOR DETERMINATION BY THE HONORABLE ANDREW J. GUILFORD**

| UNCONTROVERTED FACTS: | SUPPORTING EVIDENCE: |
|---|---|
| 1.    On December 23, 2006, Joshua Radwan and his girlfriend, Cassandra Fults, left Mission Viejo Mall in his Range Rover; Radwan had pepper spray and marijuana on his person. | 1.    Radwan Depo. at 89:6-9, 95:4-6; Fults Depo. at 57:5-22 |
| 2.    On the way home, Radwan and Fults got into an argument. | 2.    Radwan Depo. at 90:11-21 |
| 3.    Radwan pulled his Range Rover into the driveway of a school at Paseo De Colinas, near Del Cerro. | 3.    Radwan Depo. at 92:1-3; 93:7-22; Fults Depo. at 63:14-64:24 |
| 4.    Radwan and Fults got out of the car and were standing and sitting next to it. | 4.    Radwan Depo. at 93:25-94:11; Fults Depo. at 65:13-22 |

///

///

| | |
|---|---|
| 5.    Radwan kicked the tire of his Range Rover while talking to Fults. | 5.    Radwan Depo. at 94:18-25 |
| 6.    Fults was crying hysterically. | 6.    Radwan Depo. at 93:25-94:3, 104:11-17 |
| 7.    On December 23, 2006, at approximately 9:30 p.m., Sergeant Fouste, Deputy Hilliard, Deputy Prince and Deputy Kunar were working on patrol and heard a call over the dispatch radio requesting deputies respond to the area of Paseo De Colinas in Laguna Niguel regarding a report that a person was being kicked by another person next to a Range Rover. | 7.    Fouste Declaration ¶ 4; Hilliard Declaration ¶ 4; Prince Declaration ¶ 4; Kunar Declaration ¶ 4 |
| 8.    Sergeant Fouste was the first patrol car to arrive at Paseo De Colinas near Del Cerro, and saw Radwan's Range Rover parked in a driveway for a school. | 8.    Fouste Declaration ¶ 5, 28 [Exhibit "A" (Patrol Video System (PVS) Footage)] at p. 64 |
| 9.    Sergeant Fouste saw Radwan and a woman, later identified as Cassandra Fults, next to the Range Rover.<br>///<br>/// | 9.    Fouste Declaration ¶ 6; Exhibit "A" at p. 64 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 10.   Sergeant Fouste exited his patrol vehicle and asked Radwan to approach him by walking backwards towards him. | 10.   Fouste Declaration ¶ 7; Exhibit "A" at p. 64 |
| 11.   After he approached, Sergeant Fouste smelled the odor of unburned marijuana on Radwan's person. | 11.   Fouste Declaration ¶ 8 |
| 12.   Sergeant Fouste informed Radwan that he smelled the odor of marijuana on his person. | 12.   Fouste Declaration ¶ 9 |
| 13.   Sergeant Fouste grabbed Radwan's hands behind his back and searched his person. | 13.   Fouste Declaration ¶ 10; Hilliard Declaration ¶ 6; Prince Declaration ¶ 6; Exhibit "A" at p. 64 |
| 14.   Deputy Hilliard was the second patrol car to arrive at the scene, after Sergeant Fouste and immediately before Deputy Prince. | 14.   Hilliard Declaration ¶ 5, 59 [Exhibit "B" (Hilliard PVS Footage)] at p. 66 |
| 15.   Deputy Prince was the third patrol car to arrive at Paseo De Colinas, after Sergeant Fouste and immediately after Deputy Hilliard. | 15.   Prince Declaration ¶ 5, 61 [Exhibit "E" (Prince PVS Footage)] at p. 72 |
| 16.   Fults was crying loudly.<br>///<br>///<br>/// | 16.   Radwan Deposition at 104:11-17. |

4
DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 17.   Pursuant to Sergeant Fouste's search of Radwan, he discovered a clear plastic container containing approximately one tablespoon of marijuana and a canister of pepper spray. | 17.   Fouste Declaration ¶ 11; Hilliard Declaration ¶ 7; Prince Declaration ¶ 7; Exhibit "A" at p. 64 |
| 18.   Sergeant Fouste ordered Radwan to sit next to a nearby wall to separate him from Fults, so that other deputies who had arrived on the scene could continue investigating the initial report. | 18.   Fouste Declaration ¶ 12; Hilliard Declaration ¶ 8; Prince Declaration ¶ 8; Kunar Declaration ¶ 6; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72 |
| 19.   Deputy Kunar was the fourth patrol car to arrive at Paseo De Colinas, after Sergeant Fouste, Deputy Hilliard, and Deputy Prince. | 19.   Kunar Declaration ¶ 5, 29 [Exhibit "G" at p. 76 |
| 20.   Deputy Kunar stood by as backup for the other deputies. | 20.   Kunar Declaration ¶ 7; Exhibit "G" at p. 76 |
| 21.   For the most part, Deputy Kunar was responsible for keeping an eye on the patrol vehicles. | 21.   Kunar Declaration ¶ 8 |
| 22.   Deputy Prince was the handling deputy. | 22.   Fouste Declaration ¶ 13; Hilliard Declaration ¶ 9; Prince Declaration ¶ 9; Kunar Declaration ¶ 9 |
| 23.   Deputy Prince conducted a search of Radwan's vehicle. | 23.   Prince Declaration ¶ 10; Hilliard Declaration ¶ 10; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; |

DEFENDANTS' SEPARATE STATEMENT

| | Exhibit "G" at p. 76 |
|---|---|
| 24.   Deputy Prince found three (3) knives in Radwan's vehicle. | 24.   Fouste Declaration ¶ 14; Hilliard Declaration ¶ 21; Prince Declaration ¶ 14 |
| 25.   Two of the knives' blades were 6", 4", and the other knife was approximately 4" when it was folded. | 25.   Radwan Deposition 84:17-85:14, 85:22-86:4, 86:10-20. |
| 26.   At least one of the knives was in a condition that indicated that it had been practiced as a throwing knife. | 26.   Prince Declaration ¶ 15 |
| 27.   Then, at Deputy Prince's direction, Deputy Hilliard searched the rear of Radwan's Range Rover for additional contraband, such as marijuana. | 27.   Hilliard Declaration ¶ 15; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; Exhibit "G" at p. 76 |
| 28.   At one point, Sergeant Fouste ordered Radwan up to his feet, handcuffed him, and had him placed in a patrol vehicle. | 28.   Fouste Declaration ¶ 16; Hilliard Declaration ¶ 11-14; Prince Declaration ¶ 11- 13; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; Exhibit "G" at p. 76 |
| 29.   After Radwan had been placed inside a patrol car, Deputy Kunar conducted a visual search of Radwan's car.<br>///<br>///<br>/// | 29.   Kunar Declaration ¶ 12; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; Exhibit "G" at p. 76 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 30.   Deputy Kunar then briefly assisted Deputy Hilliard search the back cargo area of Radwan's Range Rover. | 30.   Kunar Declaration ¶ 13; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; Exhibit "G" at p. 76 |
| 31.   Deputy Prince gave Deputy Hilliard Radwan's identifying information and he ran a records check on Radwan through his patrol car's mobile computer terminal. | 31.   Hilliard Declaration ¶ 16; Prince Declaration ¶ 16 |
| 32.   Deputy Hilliard determined that Radwan was subject to a court-issued protective order; one database showed that the court order prohibited Radwan from possessing any weapons. | 32.   Fouste Declaration ¶ 15; Hilliard Declaration ¶ 17, 19, 60 [Exhibit "C" (Database Printout)] at p. 68; Prince Declaration ¶ 19 |
| 33.   Another database listed that Radwan was not to possess any firearms pursuant to that court order. | 33.   Hilliard Declaration ¶ 18, 61 [Exhibit "D" (Database Printout)] at p. 70; Prince Declaration ¶ 18 |
| 34.   Deputy Hilliard informed Deputy Prince of the existence of the court order and the fact that one database showed that Radwan was not to possess any weapon whereas another database showed only that Radwan was not to possess any firearm. | 34.   Hilliard Declaration ¶ 20; Prince Declaration ¶ 17 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 35. Deputy Prince contacted "Control One" (custodian of Orange County-based restraining orders) regarding the possible inconsistency between the databases and whether the pepper spray and knives fell under the provision of "other weapons." | 35. Prince Declaration ¶ 20 |
| 36. "Control One" was unable to shed any light on either issue. | 36. Prince Declaration ¶ 21 |
| 37. Sergeant Fouste spoke with Deputy Prince regarding the basis for taking Radwan to jail to be booked; he decided, and Sergeant Fouste approved, of the decision to have Radwan taken to jail to be booked for being in violation of the court order. | 37. Fouste Declaration ¶ 17; Hilliard Declaration ¶ 22; Prince Declaration ¶ 22 |
| 38. Deputy Kunar did not consult with Deputy Prince as to whether or not Radwan should be taken to the jail and booked. | 38. Kunar Declaration ¶ 10 |
| 39. Deputy Prince had previously informed Radwan that he had been placed under arrest for possession of the marijuana that Sergeant Fouste had found, but that, if the investigation uncovered no more | 39. Prince Declaration ¶ 23 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| marijuana than Sergeant Fouste had found, he would likely be released with a citation. | |
| 40.   However, having determined that Radwan had likely violated a court order, Deputy Prince informed Radwan he was now under arrest for that charge as well. | 40.   Prince Declaration ¶ 24 |
| 41.   Deputy Prince informed Radwan of his Miranda rights, which he acknowledged and waived. | 41.   Prince Declaration ¶ 25 |
| 42.   Radwan admitted that the knives Deputy Prince had found in the Range Rover were in his possession. | 42.   Prince Declaration ¶ 26 |
| 43.   Deputy Kunar later assisted Deputy Prince to fill out some paperwork related to Radwan's booking and/or personal property. | 43.   Kunar Declaration ¶ 14; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; Exhibit "G" at p. 76 |
| 44.   A tow-truck operator arrived at the scene and began to prepare to tow Radwan's vehicle away. | 44.   Hilliard Declaration ¶ 23; Kunar Declaration ¶ 15; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; Exhibit "G" at p. 76 |
| 45.   Sergeant Fouste then left the scene and did not see Radwan again that evening. | 45.   Fouste Declaration ¶ 18; Hilliard Declaration ¶ 24; Prince Declaration ¶ 28; Kunar Declaration ¶ 16; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| | 72; Exhibit "G" at p. 76 |
| 46.   At approximately 11:10 p.m., Deputy Kunar was dispatched to another call for service and left the scene. | 46.   Kunar Declaration ¶ 17; Exhibit "A" at p. 64; Exhibit "B" at p. 66; Exhibit "E" at p. 72; Exhibit "G" at p. 76 |
| 47.   Sergeant Fouste did not touch or strike or have any physical contact with Radwan at any time after he was initially placed in a patrol vehicle. | 47.   Fouste Declaration ¶ 19; Kunar Declaration ¶ 11 |
| 48.   Sergeant Fouste did not witness any other deputy touch, strike, or have any physical contact with Radwan after he was initially placed in a patrol vehicle. | 48.   Fouste Declaration ¶ 20 |
| 49.   Sergeant Fouste did not witness any of the actions following Radwan's initial placement in a patrol vehicle up to and including his being Tasered at the scene, his transportation to the jail, and his treatment at the jail. | 49.   Fouste Declaration ¶ 21 |
| 50.   Deputy Kunar was not present when Deputy Hergesheimer arrived at the scene. | 50.   Kunar Declaration ¶ 18; Hergesheimer Declaration ¶ 25, 51 [Exhibit "F" (Hergesheimer PVS Footage)] at p. 74 at 0:00 |
| 51.   Deputy Kunar did not search Radwan's person. | 51.   Kunar Declaration ¶ 21 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 52.   Deputy Kunar did not place Radwan in handcuffs. | 52.   Kunar Declaration ¶ 22 |
| 53.   After leaving the scene, Deputy Kunar did not have any further interaction with Radwan that evening or early morning. | 53.   Kunar Declaration ¶ 19 |
| 54.   On December 23, 2006, Deputy Hergesheimer was working reserve transportation detail. | 54.   Hergesheimer Declaration ¶ 4 |
| 55.   Deputy Hergesheimer arrived at the scene to transport Radwan to jail. | 55.   Hilliard Declaration ¶ 25; Prince Declaration ¶ 29; Hergesheimer Declaration ¶ 5 |
| 56.   Deputy Hergesheimer approached Paseo De Colinas, near Del Cerro, where he saw several other patrol cars parked. | 56.   Hergesheimer Declaration ¶ 6; Exhibit "F" at 00:01 |
| 57.   When Deputy Hergesheimer arrived, Radwan was in the backseat of another patrol vehicle. | 57.   Hergesheimer Declaration ¶ 7; Exhibit "F" at 00:12 |
| 58.   Deputy Hergesheimer had Radwan stand near the right front fender of his patrol car. | 58.   Hergesheimer Declaration ¶ 8; Exhibit "F" at 05:48 |
| 59.   Deputy Hergesheimer began to search Radwan for weapons and began to change his handcuffs. | 59.   Hergesheimer Declaration ¶ 9; Exhibit "F" at 06:09 |
| 60.   Deputy Hilliard was filling out paperwork near Deputy | 60.   Hilliard Declaration ¶ 26 |

| | |
|---|---|
| Prince's patrol vehicle when Deputy Hergesheimer began the process of switching Radwan's handcuffs and searching him next to Deputy Hergesheimer's patrol car. | |
| 61.   Deputy Prince was standing near Deputy Hergesheimer's patrol vehicle when Deputy Hergesheimer began the process of switching Radwan's handcuffs and searching him next to Deputy Hergesheimer's patrol car. | 61.   Prince Declaration ¶ 30 |
| 62.   Deputy Hergesheimer began to bend Radwan over the hood of his patrol vehicle so he would not have to move his arms in an uncomfortable position to conduct his search and to change the handcuffs. | 62.   Hergesheimer Declaration ¶ 11; Exhibit "F" at 07:34 |
| 63.   Deputy Hergesheimer lifted Radwan's arms up behind him to maintain physical control and to try and keep his upper body from straightening out. | 63.   Hergesheimer Declaration ¶ 16; Exhibit "F" at 07:45 |
| 64.   Radwan tried to twist his body, stiffened his body, and | 64.   Hergesheimer Declaration ¶ 12; Exhibit "F" at 08:00 - |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| turned his head toward Deputy Hergesheimer. | |
| 65.   Deputy Hergesheimer told Radwan to spread his feet apart. | 65.   Hergesheimer Declaration ¶ 10; Exhibit "F" at 08:00 |
| 66.   Deputy Hergesheimer told Radwan to hold still and stop resisting. | 66.   Hergesheimer Declaration ¶ 15 |
| 67.   Deputies Hilliard and Prince saw Radwan looking back, moving his body around, tensing up his legs, and arching his back. | 67.   Hilliard Declaration ¶ 27; Prince Declaration ¶ 31 |
| 68.   Deputies Hillard and Prince were concerned that Radwan may attempt to spit on one of them as he looked back, and that he would attempt to escalate his physical resistance. | 68.   Hilliard Declaration ¶ 28; Prince Declaration ¶ 32 |
| 69.   Deputy Prince and Deputy Hilliard approached to assist Deputy Hergesheimer. | 69.   Hilliard Declaration ¶ 29; Prince Declaration ¶ 33; Hergesheimer Declaration ¶ 17; Exhibit "F" at 08:36 |
| 70.   Deputy Hilliard stood on Deputy Hergesheimer's right side and told Radwan to stop resisting. | 70.   Hilliard Declaration ¶ 30 |
| 71.   Deputy Prince told Radwan to stop resisting and to cooperate. | 71.   Hergesheimer Declaration ¶ 18 |
| 72.   Deputy Prince stood to Deputy Hergesheimer's left and placed his hand on Radwan's neck | 72.   Hilliard Declaration ¶ 31; Prince Declaration ¶ 34; Exhibit "F" at 08:40 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| to prevent Radwan from arching his back again. | |
| 73.   Radwan continued to tense his legs, tried to arch his back, and kept trying to look back at the deputies. | 73.   Hilliard Declaration ¶ 32; Prince Declaration ¶ 35 |
| 74.   Radwan also tried to bring his legs together after he was told to keep them apart. | 74.   Prince Declaration ¶ 36 |
| 75.   Deputies Prince and Hilliard repeated their instruction for Radwan to keep his head down and forward. | 75.   Hilliard Declaration ¶ 33; Prince Declaration ¶ 37 |
| 76.   At one point, Radwan relaxed his muscles, and his head dropped to the hood once as a result of Deputy Prince's counter-pressure. | 76.   Hilliard Declaration ¶ 34; Prince Declaration ¶ 38; Exhibit "F" at 09:23 |
| 77.   Radwan challenged Deputies Hilliard and Prince to kill him. | 77.   Hilliard Declaration ¶ 35; Prince Declaration ¶ 39 |
| 78.   Deputy Prince reiterated the command for Radwan to stop resisting and responded that "We're not going to kill you." | 78.   Hilliard Declaration ¶ 36; Prince Declaration ¶ 40 |
| 79.   Radwan again tensed his legs and attempted to arch his back. | 79.   Hilliard Declaration ¶ 37; Prince Declaration ¶ 41 |

14
DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 80. Radwan was warned that if he continued to attempt to physically resist, he would be taken to the ground. | 80. Hilliard Declaration ¶ 38 |
| 81. Deputy Hergesheimer eventually gave up physical control over Radwan to the two deputies and went to the trunk of his patrol car to retrieve leg irons. | 81. Hergesheimer Declaration ¶ 19; Exhibit "F" at 10:41 |
| 82. While Deputy Hergesheimer was retrieving the leg irons, Radwan was taken to the ground on the grass portion of the sidewalk. | 82. Hergesheimer Declaration ¶ 20; Hilliard Declaration ¶ 39; Prince Declaration ¶ 42; Exhibit "F" at 10:54 |
| 83. Once Radwan was lying stomach-first on the ground, he began to roll back and forth and tried to lift his legs. | 83. Hilliard Declaration ¶ 40; Prince Declaration ¶ 43 |
| 84. Deputy Hilliard held down his legs to prevent him from kicking. | 84. Hilliard Declaration ¶ 41 |
| 85. Deputy Prince was concerned that Radwan was attempting to get to his knees, from which he could establish a fighting stance. | 85. Prince Declaration ¶ 44 |
| 86. Deputy Prince and Deputy Hilliard continued to tell Radwan to stop resisting. | 86. Hilliard Declaration ¶ 42; Prince Declaration ¶ 45 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 87.   Radwan continued to physically resist, and Deputy Prince deployed the Taser against Radwan for 5 seconds in "drive stun" mode. | 87.   Hilliard Declaration ¶ 44; Prince Declaration ¶ 46; Hergesheimer Declaration ¶ 21 |
| 88.   Immediately after the application of the Taser, Radwan stopped physically resisting. | 88.   Hilliard Declaration ¶ 45; Prince Declaration ¶ 47 |
| 89.   Deputy Hilliard told Radwan that he needed to stand up and that the deputies would place him in the patrol car; Deputy Hilliard warned him that if he resumed physically resisting, he would be Tased again. | 89.   Hilliard Declaration ¶ 47; Prince Declaration ¶ 49; Hergesheimer Declaration ¶ 22; Exhibit "F" at 12:00 |
| 90.   Then, Deputy Hergesheimer's ankle cuffs were applied to Radwan. | 90.   Hilliard Declaration ¶ 46; Prince Declaration ¶ 48; Hergesheimer Declaration ¶ 23 |
| 91.   Radwan complied and he was placed in the back seat of Deputy Hergesheimer's patrol vehicle. | 91.   Hilliard Declaration ¶ 48; Prince Declaration ¶ 50; Exhibit "F" at 12:39 |
| 92.   Neither Deputy Hilliard nor Deputy Hergesheimer used a Taser on Radwan. | 92.   Hilliard Declaration ¶ 49; Kunar Declaration ¶ 20; Hergesheimer Declaration ¶ 24, 43 |
| 93.   Apart from the single 5 second "drive stun" application of the Taser by Deputy Prince, deputies did not see any other use of a Taser on Radwan. | 93.   Hilliard Declaration ¶ 50; Prince Declaration ¶ 51, 52; Hergesheimer Declaration ¶ 45 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 94. Hergesheimer then transported Radwan to the jail. | 94. Hilliard Declaration ¶ 51; Prince Declaration ¶ 53; Hergesheimer Declaration ¶ 26; Exhibit "F" at 21:33 |
| 95. Deputies Hilliard and Prince, did not have any further interaction with Radwan that evening or early morning. | 95. Hilliard Declaration ¶ 52; Prince Declaration ¶ 54 |
| 96. Radwan tried to engage Deputy Hergesheimer in conversation about his arrest, but the deputy declined to respond. | 96. Hergesheimer Declaration ¶ 27; Exhibit "F" at 24:25 |
| 97. Radwan shifted his position in the backseat several times on the way to the jail. | 97. Hergesheimer Declaration ¶ 28; Exhibit "F" at 32:22 |
| 98. At one point, Deputy Hergesheimer asked what Radwan was doing, and he said he was trying to pull his jacket on. | 98. Hergesheimer Declaration ¶ 29; Exhibit "F" at 32:46 |
| 99. Radwan did not complain of any pain while he was in the back seat on the way to the jail. | 99. Hergesheimer Declaration ¶ 30 |
| 100. At the jail's entry gate, Deputy Hergesheimer informed jail personnel that he had one male uncooperative arrestee. | 100. Hergesheimer Declaration ¶ 31; Exhibit "F" at 43:18 |
| 101. On December 24, 2006, at approximately 12:10 a.m., Deputies Padilla, Garcia, Foster | 101. Padilla Declaration ¶ 6, 76 [Exhibit "H" (Jail Incident Report)] at p.78; Garcia Declaration ¶ 6; Foster Declaration ¶ 6; |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| and Hernandez were informed that a transporting deputy was bringing in an uncooperative male, and needed assistance. | Hernandez Declaration ¶ 6 |
| 102. Several jail deputies came out of the entryway to assist. | 102. Hergesheimer Declaration ¶ 32; Padilla Declaration ¶ 7; Garcia Declaration ¶ 7; Foster Declaration ¶ 7; Hernandez Declaration ¶ 7; Exhibit "F" at 44:30 |
| 103. Deputy Hergesheimer informed Deputy Padilla that a small amount of marijuana, as well as a number of weapons, had been found in Radwan's possession. | 103. Padilla Declaration ¶ 9; Exhibit "H" at p. 78 |
| 104. Deputy Hergesheimer also informed Deputy Padilla that Radwan had physically struggled with the deputies at the scene and that he had to be Tased. | 104. Padilla Declaration ¶ 10; Exhibit "H" at p. 78 |
| 105. Deputy Padilla opened the rear passenger side door of the patrol vehicle and explained the booking process to Radwan and the need for his cooperation. | 105. Padilla Declaration ¶ 11; Exhibit "F" at 46:42; Exhibit "H" at p. 78 |
| 106. Radwan twice interrupted Deputy Padilla as he was explaining what would happen and the need for his cooperation. | 106. Padilla Declaration ¶ 12; Exhibit "F" 46:45, 47:01; Exhibit "H" at p. 78 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 107. Deputy Padilla told Radwan to exit the patrol car, but he said he could not because his legs were chained together. | 107. Padilla Declaration ¶ 13; Foster Declaration ¶ 8; Exhibit "F" at 47:21 |
| 108. Radwan's upper body was near the right side of the patrol car, so Deputy Padilla moved over to the left side and told Radwan to exit feet-first. | 108. Padilla Declaration ¶ 14, 78 [Exhibit "J" (Jail Handheld Video Recording) at 00:04]; Exhibit "F" at 47:39 |
| 109. Deputy Foster was on the left driver side of the back seat with Deputy Padilla when Radwan was ordered to exit the patrol car feet first. | 109. Foster Declaration ¶ 9 |
| 110. Radwan began to slide across the back seat, but then said he needed help. | 110. Padilla Declaration ¶ 15; Foster Declaration ¶ 10; Exhibit "F" at 47:40 - 47:44 |
| 111. After coming to the left side of the back seat, Radwan asked deputies to pull his legs to get him out of the patrol car. | 111. Padilla Declaration ¶ 16; Foster Declaration ¶ 11; Exhibit "F" at 47:53; Exhibit "J" at 00:16 |
| 112. Two of the jail deputies pulled Radwan out of the back seat of Deputy Hergesheimer's patrol vehicle, feet first. | 112. Hergesheimer Declaration ¶ 33; Padilla Declaration ¶ 17; Foster Declaration ¶ 12; Hernandez Declaration ¶ 8; Exhibit "F" at 47:55; Exhibit "J" at 00:25; Exhibit "H" at p. 78 |

| | |
|---|---|
| 113. Deputy Hergesheimer, was on the other side of the open door, so Deputy Foster walked away to let him pass. | 113. Foster Declaration ¶ 13 |
| 114. Radwan then asked for assistance in getting up. | 114. Padilla Declaration ¶ 18; Exhibit "J" at 00:32 |
| 115. Deputy Hergesheimer helped Radwan to his feet by grabbing his left arm; Deputy Padilla took Radwan's right arm. | 115. Hergesheimer Declaration ¶ 34; Padilla Declaration ¶ 19; Garcia Declaration ¶ 8; Foster Declaration ¶ 14; Exhibit "J" at 00:36 |
| 116. Radwan refused to walk and said that his ankle was too tight. | 116. Hergesheimer Declaration ¶ 35; Padilla Declaration ¶ 20; Exhibit "J" at 00:45 |
| 117. Deputy Padilla informed Radwan that they would be removed shortly. | 117. Padilla Declaration ¶ 21; Exhibit "J" at 00:55 |
| 118. Radwan began to scream, to slump toward the ground, and requested that he be carried. | 118. Hergesheimer Declaration ¶ 36; Padilla Declaration ¶ 22, 23; Garcia Declaration ¶ 9, 10; Foster Declaration ¶ 15, 16; Exhibit "J" at 00:56 – 01:21; Exhibit "H" at p. 78 |
| 119. Deputy Padilla did not loosen the leg chains while still in the parking area because Radwan had not been properly searched by jail personnel, and they were still in a relatively unsecured area. | 119. Padilla Declaration ¶ 24 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 120. Deputy Garcia lifted Radwan by the legs or the leg-iron chain, after which Radwan stopped screaming. | 120. Hergesheimer Declaration ¶ 37; Padilla Declaration ¶ 25, 26; Garcia Declaration ¶ 11, 12; Foster Declaration ¶ 17, 18; Hernandez Declaration ¶ 9; Exhibit "J" at 01:22 – 01:53; Exhibit "H" at p. 78 |
| 121. Radwan was placed standing at the triage counter to answer questions from the triage nurse. | 121. Hergesheimer Declaration ¶ 38; Padilla Declaration ¶ 27, 28; Garcia Declaration ¶ 13; Foster Declaration ¶ 19; Hernandez Declaration ¶ 10; Exhibit "J" at 01:53; Exhibit "H" at p. 78 |
| 122. Deputy Hergesheimer stood to Radwan's left. | 122. Hergesheimer Declaration ¶ 39; Garcia Declaration ¶ 14; Foster Declaration ¶ 20; Hernandez Declaration ¶ 11 |
| 123. Deputy Padilla stood to Radwan's right and one or more other jail deputies were in the vicinity observing. | 123. Hergesheimer Declaration ¶ 40; Garcia Declaration ¶ 14; Foster Declaration ¶ 20; Hernandez Declaration ¶ 11 |
| 124. Deputy Padilla did not step on Radwan's ankles or deliberately stand on the chain between his ankle cuffs. | 124. Padilla Declaration ¶ 29 |
| 125. As Radwan was answering the triage nurse's questions, he became loud and excited, and alternated to being quiet. | 125. Padilla Declaration ¶ 30; Exhibit "J" at 02:00 – 05:52; Exhibit "H" at p. 78 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 126. While he was answering triage questions, Radwan gave non-responsive answers and made argumentative statements regarding what had happened during his arrest and his entry into the IRC. | 126. Padilla Declaration ¶ 31; Exhibit J at 02:00 – 05:52 |
| 127. Radwan also said that he wanted to kill himself. | 127. Radwan Depo. at 153:2-7; Padilla Declaration ¶ 66; Exhibit J at 4:44-5:05 |
| 128. The triage nurse eventually was able to finish the screening. | 128. Padilla Declaration ¶ 32; Exhibit "J" at 05:52; Exhibit "H" at p. 78 |
| 129. Deputy Hergesheimer, who had been standing to Radwan's left, stepped away and Deputy Foster stepped to Radwan's left and took Radwan's left arm. | 129. Padilla Declaration ¶ 33; Garcia Declaration ¶ 15; Foster Declaration ¶ 21; Exhibit "J" at 05:57 |
| 130. After triage, the jail deputies led Radwan toward an uncuff area to be searched and uncuffed. | 130. Hergesheimer Declaration ¶ 41; Padilla Declaration ¶ 34; Garcia Declaration ¶ 16; Foster Declaration ¶ 22; Hernandez Declaration ¶ 12; Exhibit "J" at 06:01; Exhibit "H" at p. 78 |
| 131. Deputy Hergesheimer did not see any deputy place Radwan in a medical observation cell. | 131. Hergesheimer Declaration ¶ 43 |
| 132. Radwan took several steps, and then dropped to the floor and said that he could not walk. | 132. Padilla Declaration ¶ 35; Garcia Declaration ¶ 17; Foster Declaration ¶ 23; Hernandez Declaration ¶ 14; Exhibit "J" at 06:07; Exhibit "H" at p. 78 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 133. Up to this point, Radwan had repeatedly been uncooperative and his odd behavior indicated he might have been under the influence of drugs. | 133. Padilla Declaration ¶ 36; Exhibit "H" at p. 78 |
| 134. As a result, Deputy Padilla decided to institute a booking process delay and place Radwan in a medical observation cell so that he could be observed until he was able to finish the booking process. | 134. Padilla Declaration ¶ 37; Garcia Declaration ¶ 19; Foster Declaration ¶ 25; Hernandez Declaration ¶ 15; Exhibit "H" at p. 78 |
| 135. Deputy Garcia approached and lifted Radwan's legs by grabbing the ankle cuff chain. | 135. Padilla Declaration ¶ 38; Garcia Declaration ¶ 18; Foster Declaration ¶ 24; Exhibit "J" at 06:10; Exhibit "H" at p. 79 |
| 136. Deputies began to carry Radwan down a hallway toward the medical observation cells. | 136. Padilla Declaration ¶ 39; Garcia Declaration ¶ 20; Foster Declaration ¶ 26; Hernandez Declaration ¶ 16; Exhibit "J" at 06:14 – 06:52; Exhibit "H" at p. 79 |
| 137. Along the way, Deputy Streeter grabbed Radwan's right foot. | 137. Garcia Declaration ¶ 22; Exhibit "J" at 06:31 |
| 138. Sergeant Essoe was informed that a transporting deputy had brought in an uncooperative male, and Deputy Padilla had decided to institute a booking process delay. | 138. Essoe Declaration ¶ 6; Padilla Declaration ¶ 40; Garcia Declaration ¶ 21; Foster Declaration ¶ 27; Hernandez Declaration ¶ 17; Exhibit "H" at p. 79 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 139. Sergeant Essoe responded to the medical observation cells to observe Radwan's placement in a medical observation cell. | 139. Essoe Declaration ¶ 7; Exhibit "H" at p. 79 |
| 140. Deputy Hernandez entered the cell first. | 140. Essoe Declaration ¶ 8; Padilla Declaration ¶ 41; Garcia Declaration ¶ 23 Foster Declaration ¶ 28; Hernandez Declaration ¶ 18; Exhibit "J" at 06:53 |
| 141. Deputy Hernandez was followed by Deputy Foster and Deputy Padilla, as they each held one of Radwan's arms. | 141. Essoe Declaration ¶ 9; Padilla Declaration ¶ 41; Garcia Declaration ¶ 23; Foster Declaration ¶ 28; Hernandez Declaration ¶ 19; Exhibit "J" at 06:54; Exhibit "H" at p. 79 |
| 142. Then, Deputy Garcia entered with Deputy Streeter, as they both had control of Radwan's legs. | 142. Essoe Declaration ¶ 10; Padilla Declaration ¶ 42; Garcia Declaration ¶ 24; Foster Declaration ¶ 29; Hernandez Declaration ¶ 20; Exhibit "J" at 06:57 |
| 143. Deputy Streeter and Deputy Garcia began to remove Radwan's boots and socks while the ankle cuffs remained on Radwan's ankles. | 143. Essoe Declaration ¶ 11; Padilla Declaration ¶ 43; Garcia Declaration ¶ 25; Foster Declaration ¶ 30; Hernandez Declaration ¶ 21; Exhibit "J" at 07:01 |
| 144. The ankle cuffs had been secured over Radwan's ankles and socks, but deputies were able to remove his socks without loosening the ankle cuffs. | 144. Garcia Declaration ¶ 26; Foster Declaration ¶ 31; Exhibit "J" at 06:40, 07:10 – 07:29 |

| | |
|---|---|
| 145. Once Deputies Streeter and Garcia had removed his boots and socks, Deputy Garcia then unlocked the ankle cuffs and momentarily exited the cell. | 145. Essoe Declaration ¶ 12; Padilla Declaration ¶ 44; Garcia Declaration ¶ 27; Foster Declaration ¶ 32; Hernandez Declaration ¶ 22; Exhibit "J" at 07:37 – 08:05 |
| 146. Deputy Garcia handed the ankle cuffs off to another deputy who had been standing outside the cell. | 146. Garcia Declaration ¶ 28; Exhibit "J" at 08:05 |
| 147. At this point, Deputy Hernandez took control of Radwan's left leg, Deputy Streeter took control of Radwan's right leg, Deputy Foster maintained control of Radwan's left arm, and Deputy Padilla maintained control over Radwan's right arm. | 147. Essoe Declaration ¶ 13; Padilla Declaration ¶ 45; Garcia Declaration ¶ 29; Foster Declaration ¶ 33; Hernandez Declaration ¶ 23; Exhibit "J" at 08:05; Exhibit "H" at p. 79 |
| 148. Deputy Garcia returned to the cell, got a Taser, and held it in his right hand, pointing at the ground. | 148. Essoe Declaration ¶ 14; Padilla Declaration ¶ 46; Garcia Declaration ¶ 30; Foster Declaration ¶ 34; Hernandez Declaration ¶ 24; Exhibit "J" at 08:16; Exhibit "H" at p. 79 |
| 149. Deputies Streeter, Garcia, and Hernandez then removed Radwan's pants. | 149. Essoe Declaration ¶ 15; Padilla Declaration ¶ 47; Garcia Declaration ¶ 31; Foster Declaration ¶ 35; Hernandez Declaration ¶ 25; Exhibit "J" at 08:23 – 08:39; Exhibit "H" at p. 79 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 150. Deputy Streeter and Deputy Hernandez crossed Radwan's feet behind his legs and pushed them down to keep Radwan from being able to kick his feet. | 150. Essoe Declaration ¶ 16; Padilla Declaration ¶ 48; Garcia Declaration ¶ 32; Foster Declaration ¶ 36; Hernandez Declaration ¶ 26; Exhibit "J" at 08:40; Exhibit "H" at p. 79 |
| 151. Deputy Garcia aimed his Taser at Radwan as Deputy Padilla informed Radwan that he would remove the handcuffs, and warned that if he attempted to resist when he did so, Radwan would be Tased. | 151. Essoe Declaration ¶ 17; Padilla Declaration ¶ 49; Garcia Declaration ¶ 33; Foster Declaration ¶ 37; Hernandez Declaration ¶ 27; Exhibit "J" at 09:23 |
| 152. Deputy Padilla and Deputy Foster removed Radwan's handcuffs and removed his jacket and shirt. | 152. Essoe Declaration ¶ 18; Padilla Declaration ¶ 50; Garcia Declaration ¶ 34; Foster Declaration ¶ 38; Hernandez Declaration ¶ 28; Exhibit "J" at 09:38 – 10:42; Exhibit "H" at p. 79 |
| 153. Deputy Padilla maintained a control hold on Radwan's right arm. | 153. Essoe Declaration ¶ 19; Padilla Declaration ¶ 51; Garcia Declaration ¶ 35; Foster Declaration ¶ 39; Hernandez Declaration ¶ 29 |
| 154. Deputy Foster maintained a control hold on Radwan's left arm. | 154. Essoe Declaration ¶ 20; Padilla Declaration ¶ 52 Garcia Declaration ¶ 36; Foster Declaration ¶ 40; Hernandez Declaration ¶ 30 |
| 155. Deputy Garcia threw Radwan's jacket out of the cell. | 155. Essoe Declaration ¶ 21; Padilla Declaration ¶ 53; Garcia Declaration ¶ 37; Foster Declaration ¶ 41; Hernandez |

DEFENDANTS' SEPARATE STATEMENT

| | Declaration ¶ 31; Exhibit "J" at 10:34 |
|---|---|
| 156. Deputy Hernandez took Radwan's shirt and stepped out of the cell, leaving Deputy Streeter in control of both Radwan's legs. | 156. Essoe Declaration ¶ 22; Padilla Declaration ¶ 54; Garcia Declaration ¶ 38 Foster Declaration ¶ 42; Hernandez Declaration ¶ 32; Exhibit "J" at 10:43 |
| 157. Deputy Foster then ordered Radwan to place his left hand under his belly button and to leave it there. | 157. Essoe Declaration ¶ 23; Padilla Declaration ¶ 55; Garcia Declaration ¶ 39; Foster Declaration ¶ 43; Hernandez Declaration ¶ 33; Exhibit "J" at 10:49 |
| 158. Deputy Foster then helped Radwan place his left hand under his stomach. | 158. Essoe Declaration ¶ 24; Padilla Declaration ¶ 56; Garcia Declaration ¶ 40; Foster Declaration ¶ 44; Hernandez Declaration ¶ 34; Exhibit "J" at 10:56 |
| 159. At this point, Deputy Garcia stepped back [into the cell] and aimed his Taser at the ground. | 159. Padilla Declaration ¶ 57; Garcia Declaration ¶ 41; Exhibit "J" at 10:59 |
| 160. Deputy Padilla then ordered Radwan to place his right hand under his stomach and to leave it there. | 160. Essoe Declaration ¶ 25; Padilla Declaration ¶ 58; Garcia Declaration ¶ 42; Foster Declaration ¶ 45; Hernandez Declaration ¶ 35; Exhibit "J" at 11:00 |
| 161. Deputy Padilla then helped Radwan to place his right hand underneath his stomach and ordered him to grab his left hand. | 161. Essoe Declaration ¶ 26; Padilla Declaration ¶ 59; Garcia Declaration ¶ 43; Foster Declaration ¶ 46; Hernandez Declaration ¶ 36; Exhibit "J" at 11:10 |
| 162. Deputy Padilla then ordered Radwan to remain in that position | 162. Essoe Declaration ¶ 27; Padilla Declaration ¶ 60; Garcia Declaration ¶ 44; |

27
DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| until all the deputies exited the cell; he warned Radwan that if he attempted to get up before all the deputies had exited, a Taser would be used against him. | Foster Declaration ¶ 47; Hernandez Declaration ¶ 37; Exhibit "J" at 11:19 |
| 163. At this point, Deputy Garcia aimed the Taser at Radwan's back in case he attempted to get up or fight before all of the deputies had exited the cell. | 163. Garcia Declaration ¶ 45; Exhibit "J" at 11:30 |
| 164. Deputy Foster then exited the cell. | 164. Essoe Declaration ¶ 28; Padilla Declaration ¶ 61; Garcia Declaration ¶ 46; Foster Declaration ¶ 48; Hernandez Declaration ¶ 38; Exhibit "J" at 11:29 |
| 165. Then, Deputy Padilla exited the cell. | 165. Essoe Declaration ¶ 29; Padilla Declaration ¶ 62; Garcia Declaration ¶ 47 Foster Declaration ¶ 49; Hernandez Declaration ¶ 39; Exhibit "J" at 11:32 |
| 166. Then, Deputy Streeter exited the cell, followed immediately by Deputy Garcia. | 166. Essoe Declaration ¶ 30 Padilla Declaration ¶ 63 Garcia Declaration ¶ 48 Foster Declaration ¶ 50 Hernandez Declaration ¶ 40 Exhibit "J" at 11:35 |
| 167. Once there were no deputies remaining in the cell and the door was closed, Radwan was ordered to get up. | 167. Essoe Declaration ¶ 31 Padilla Declaration ¶ 64 Garcia Declaration ¶ 49 Foster Declaration ¶ 51 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| | Hernandez Declaration ¶ 41 |
| | Exhibit "J" at 11:42 |
| 168. Radwan rolled onto his right side and refused to get up. | 168. Essoe Declaration ¶ 32<br>Padilla Declaration ¶ 65<br>Garcia Declaration ¶ 50<br>Foster Declaration ¶ 52<br>Hernandez Declaration ¶ 42<br>Exhibit "J" at 11:49 – 13:16 |
| 169. Radwan's clothing was removed at the behest of the jail's mental health staff, who were concerned regarding his threats to kill himself, which he made during triage. | 169. Padilla Declaration ¶ 66 |
| 170. At 2:02 a.m., Radwan was able to stand and talk during a check of his medical observation cell. | 170. Padilla Declaration ¶ 77 [Exhibit "I" (Sobering Cell Activity Log)] at p. 81 |
| 171. At 2:14 a.m., Radwan was standing in his medical observation cell. | 171. Exhibit "I" at p. 81 |
| 172. At 3:14 a.m., Radwan was standing in his medical observation cell. | 172. Exhibit "I" at p. 81 |
| 173. At 3:45 a.m., Radwan was standing in his medical observation cell. | 173. Exhibit "I" at p. 81 |

DEFENDANTS' SEPARATE STATEMENT

| | |
|---|---|
| 174. At 5:45 a.m., Radwan was standing in his medical observation cell, and kicked the door during a check of his cell. | 174. Exhibit "I" at p. 81 |
| 175. At 7:45 a.m., Radwan was standing in his medical observation cell. | 175. Exhibit "I" at p. 82 |
| 176. At 7:57 a.m., Radwan was standing in his medical observation cell. | 176. Exhibit "I" at p. 82 |
| 177. At 8:15 a.m., Radwan was standing in his medical observation cell. | 177. Exhibit "I" at p. 82 |
| 178. At 8:20 a.m., Radwan was standing in his medical observation cell. | 178. Exhibit "I" at p. 82 |
| 179. At approximately 2:30 a.m., Deputy Padilla checked on Radwan and he was standing at the window of the cell. | 179. Padilla Declaration ¶ 67; Exhibit "I" at p. 81 |
| 180. Sergeant Essoe was present to observe the placement of Radwan in the cell, but did not have any verbal or physical interaction with Radwan. | 180. Essoe Declaration ¶ 33<br>Padilla Declaration ¶ 68<br>Garcia Declaration ¶ 51<br>Foster Declaration ¶ 53<br>Hernandez Declaration ¶ 43 |
| 181. Deputy Jarrett Kurimay was not present at the IRC during the incident. | 181. Essoe Declaration ¶ 34<br>Padilla Declaration ¶ 69<br>Garcia Declaration ¶ 52 |

DEFENDANTS' SEPARATE STATEMENT

| | Foster Declaration ¶ 54 |
| | Hernandez Declaration ¶ 44 |
| | Jarrett Kurimay Declaration ¶ 4 |
| 182. Sergeants Fouste and Essoe, and Deputies Hilliard, Prince, Kunar, Hergesheimer, Padilla, Garcia Foster and Hernandez did not observe any actions by any other deputy or employee of the Orange County Sheriff's Department to suggest any violation of Radwan's constitutional rights. | 182. Fouste Declaration ¶ 22 <br> Hilliard Declaration ¶ 53 <br> Prince Declaration ¶ 55 <br> Kunar Declaration ¶ 23 <br> Hergesheimer Declaration ¶ 46 <br> Essoe Declaration ¶ 35 <br> Padilla Declaration ¶ 70 <br> Garcia Declaration ¶ 53 <br> Foster Declaration ¶ 55 <br> Hernandez Declaration ¶ 45 |
| 183. Deputy Jarrett Kurimay was not present at the Paseo De Colinas Incident. | 183. Kurimay Declaration ¶ 6. |
| 184. Plaintiff eventually pled guilty to, and was convicted for, his possession of marijuana in this case. | 184. Cha Declaration ¶ 2 [Exhibit "K" (Minute Order)] at p. 86-87 |

## INDIVIDUAL DEFENDANTS' CONCLUSIONS OF LAW

1.     First, it is undisputed that Deputy Jarrett Kurimay was not present or otherwise involved in either the patrol or the jail incident. (SS 181, 183) Accordingly, each of Plaintiff's claims against Deputy Jarrett Kurimay must fail on this basis alone.

2.     Second, it is undisputed that Kunar did not use any physical force against Plaintiff, and that he did not arrive at the subject location until after the

detention and arrest for possession of marijuana, and that he left the scene before any alleged excessive force took place.  Moreover, Kunar undisputedly was not involved in the decision whether Plaintiff should be arrested and booked for apparently violating a court's restraining/protective order.  Therefore, Plaintiff's claims against Kunar should be dismissed on this basis alone.

      3.     Third, it is also undisputed that Fouste left the scene of the patrol incident before any alleged excessive force.  Accordingly, any force-related claims against Fouste should be dismissed on this basis alone.

      4.     In addition, it is undisputed that Fouste initiated the contact with Plaintiff without other deputies present, and that he began searching Plaintiff before other deputies were present.  As a result, Plaintiff's unreasonable search and seizure-related claims based on Fouste's actions cannot survive as against any other Defendants.

      5.     Fourth, it is undisputed that Essoe did not even touch Plaintiff, much less use any excessive or unreasonable physical force against Plaintiff.  Nor did he cause any Defendant to use unreasonable force against Plaintiff.  Plaintiff's excessive force claims against Essoe should therefore be dismissed on this basis alone.

      6.     Fifth, it is undisputed that none of the jail deputy Defendants related to the incident at the Orange County Jail were at Paseo De Colinas during the incident in which Plaintiff was seized.  As a result, claims related to the Paseo De Colinas incident should be dismissed with regard to Hernandez, Garcia, Padilla, and Essoe on this basis alone.

      7.     . Similarly, none of the deputies involved in the incident at Paseo De Colinas were involved in the jail incident, except Hergesheimer.  As a result, any claims regarding the jail incident should be dismissed with regard to Prince, Hilliard, Kunar, and Fouste on this basis alone.

DEFENDANTS' SEPARATE STATEMENT

8.     Sixth, Hergesheimer was not present for the search and seizure of Plaintiff. Furthermore, Hergesheimer's involvement at the jail terminated after the triage screening. Accordingly, Hergesheimer is entitled to summary adjudication of any search and seizure-related claims, and with regard to any excessive force-related claims regarding any use of force after the triage screening, on that basis alone.

9.     As all Defendants acted reasonably and constitutionally, as set forth below, they are also entitled to have the related state law claims dismissed as well. *See, Susag v. City of Lake Forest*, 94 Cal.App.4th 1401, 1412-13 (2002).

10.     In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court addressed the connection between a 42 U.S.C. § 1983 action and a plaintiff's criminal conviction: "[W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 486-87.

11.     The Supreme Court clarified that a cause of action under 42 U.S.C. § 1983 that would imply the invalidity of a conviction does not even accrue until the conviction or sentence has been invalidated. *Id.* at 489.

12.     Similarly, the California Court of Appeal in *Susag, supra*, held that a state law cause of action that would imply the invalidity of a criminal conviction is barred unless and until the conviction has been invalidated. *Susag*, 94 Cal.App.4th at 1412-13. Subsequently, the California Supreme Court affirmed *Susag* and confirmed that state law causes of action that would imply the invalidity of a conviction are barred until they have been invalidated. *Yount v. County of Sacramento*, 43 Cal.4th 885, 902 (2008).

///

///

13. Plaintiff's claim that Fouste's search of Plaintiff was unconstitutional necessarily implies the invalidity of his conviction as the search revealed the marijuana in his possession.

14. Similarly, Plaintiff's claim that the initial investigatory detention/arrest was unconstitutional also necessarily implies the invalidity of Plaintiff's conviction. That is because the investigatory detention/arrest led directly to the search.

15. Therefore, under *Heck*, Plaintiff has no § 1983 claim for unreasonable search or seizure for Fouste's initial investigatory detention/arrest or search of his person.

16. Similarly, under *Susag/Yount*, Plaintiff has no state law causes of action with regard to Fouste's initial investigatory detention/arrest and search of his person.

17. Notwithstanding *Heck* and *Susag/Yount*, the individual Defendants are entitled to qualified immunity.

18. Police officers are entitled to qualified immunity from liability under 42 U.S.C. § 1983. *Thorsted v. Kelly*, 858 F.2d 571 (9th Cir. 1988). Qualified immunity is designed to shield from liability, "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343 (1986). "The central purpose of affording public officials qualified immunity from suit is to protect them from undue interference with their duties and from potentially disabling threats of liability." *Elder v. Holloway*, 510 U.S. 510 (1994).[1] A determination of qualified immunity is particularly appropriate for summary judgment. The Supreme Court has repeatedly "stressed the importance

---

[1] The doctrine assumes that officers do not "knowingly violate the law." *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994). To overcome the presumption of immunity, "a plaintiff must show that the officer's conduct was so

of resolving immunity questions at the earliest possible stage in litigation."
*Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  "[T]he entitlement is an *immunity from suit* rather than a mere defense to liability." *Id.*  (emphasis in original).

19.    In a suit against a police officer for an alleged violation of a constitutional right, the court must consider a two-part test. *Saucier v. Katz*, 533 U.S. 194 (2001) (abrogated as to the rigidity of the sequence of the test in *Pearson v. Callahan*, 129 S.Ct . 808, 818 (2009)).  The first inquiry is whether the facts alleged, in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional right.  *Id.* at 2156.  If no constitutional right would have been violated, the defendant is entitled to qualified immunity.[2]  *Id.*

20.    Assuming a plaintiff clears the first hurdle of the qualified immunity test, the second inquiry is whether the right was clearly established. *Saucier*, 533 U.S. at 2156.  A broad inquiry is not enough:  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*  The plaintiff has the burden to establish the right allegedly violated was clearly established at the time of the alleged misconduct. *Perkins v. City of West Covina*, 113 F.3d 1004, 1008 (9th Cir. 1997).  The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. *Saucier*, 533 U.S. at 201; *see*, *Richardson v. Oldham*, 12 F.3d 1373, 1381 (5th Cir. 1994) (the plaintiff must demonstrate "the illegality of the challenged conduct was clearly established in factual circumstances closely analogous to those of [the] case [at

---

egregious that any reasonable person would have recognized a constitutional violation."

[2] In addition, any state law claims based on the same alleged misconduct should also be dismissed. *See*, *Susag*, 94 Cal.App.4th at 1412-13.

DEFENDANTS' SEPARATE STATEMENT

bar].").

21.    If a reasonable officer in the defendant's position could have believed his conduct was lawful in light of clearly established law, he is entitled to qualified immunity. *Hunter*, 502 U.S. at 227. "The inquiry is not 'whether another reasonable or more reasonable interpretation of the events can be constructed... after the fact.' [Citation]. Rather, the issue is whether a reasonable officer could have believed that his conduct was justified." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996) (citation omitted). Hence, if government agents "of reasonable competence" could disagree on whether a chosen course of action is constitutional, "immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

22.    Several Defendants patently could not have violated Plaintiff's constitutional rights (either at all, or with regard to specific claims and incidents), and therefore, are entitled to qualified immunity on this ground alone.

23.    In addition, the individual Defendants are entitled to qualified immunity because the search and seizure of Plaintiff was reasonable, any use of force against Plaintiff was reasonable, and in any event reasonable officers could have believed that the search and seizure, and uses of force were reasonable under the circumstances.

24.    The Fourth Amendment authorizes brief, investigatory seizures (or *Terry* stops), so long as police have reasonable, articulable suspicions of criminal activity. *Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002). "The reasonable suspicion standard 'is a less demanding standard than probable cause,' and merely requires 'a minimal level of objective justification.'" *Id.* (quoting, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

25.    When Sergeant Fouste saw Plaintiff and a crying woman next to Plaintiff's Range Rover, there was reasonable suspicion that Plaintiff was the reported assaulter.

26.     Therefore, Fouste's initial commands for Plaintiff to approach and turn around were part of a reasonable investigatory detention and such conduct was not an unreasonable seizure.

27.     Moreover, against this legal backdrop, even if these actions are deemed to have been unconstitutional—which they did not—a reasonable officer in Fouste's position could have believed his actions were reasonable under the circumstances.  Accordingly, Defendants are entitled to qualified immunity for unreasonable seizure claims related to the initial detention.

28.     The Fourth Amendment requires probable cause before making a warrantless arrest. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009); *see also, Michigan v. Summers*, 452 U.S. 692, 700 (1981). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Ramirez*, 560 F.3d at 1023. "[W]hen an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." *Virginia v. Moore*, 553 U.S. 164, 128 S.Ct. 1598, 1604 (2008).

29.     "A *Terry* stop involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons." *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987).  If the stop proceeds beyond these limitations, an arrest occurs, which requires probable cause. *Id.* "There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning." *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir.1990).  Accordingly, a *Terry* stop ripens into an arrest at the point where the police have probable cause to arrest. *See, U.S. v. Richard*, 732 F.Supp. 656, 663 (W.D. Va. 1990).

30.     In *Richard*, several criminal defendants were subject to an investigatory detention when a police dog alerted to the presence of drugs among their possessions. *Id.* at 659. The defendants were not formally told they were placed under arrest until after they had been transported from the scene and further investigation revealed the precise location and amount of drugs. *Id.* The court ruled the seizure had ripened into an arrest the moment the dog alerted to the drugs, because at that moment, "the suspects were no longer free to leave, nor would a reasonable man have felt that they were." *Id.* at 663. Similarly, in the instant case, Plaintiff could not have felt that he was free to leave when Fouste told him that he had detected the marijuana.

31.     Fouste had probable cause to arrest Plaintiff for possession of marijuana. *United States v. Humphries*, 372 F.3d 653, 659-660 (4th Cir. 2004) ("[I]f an officer smells the odor of marijuana in circumstances where the officer can localize its source to a person, the officer has probable cause to believe that the person has committed or is committing the crime of possession of marijuana.").

32.     Moreover, Fouste told Plaintiff that he smelled marijuana on his person (SS 12); Prince also informed Plaintiff he was under arrest before Prince began searching the Range Rover (SS 39). Accordingly, as in *Richards*, Plaintiff was not free to leave, nor would a reasonable person have felt that he was. As a result, at that point, Plaintiff was under arrest.

33.     Therefore, Fouste's arrest of Plaintiff did not violate the Fourth Amendment. Furthermore, even if Fouste's arrest in fact lacked probable cause, though it did not, a reasonable officer in his position could have believed the arrest was justified. Even an officer who reasonably, but incorrectly, concludes probable cause exists for an arrest is entitled to qualified immunity. *Hunter*, 502 U.S. at 227. For that reason as well, Defendants are entitled to qualified immunity for Plaintiff's unreasonable seizure-related claims.

1    34.    "A custodial arrest of a suspect based on probable cause is a

2  reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a

3  search incident to the arrest requires no additional justification… a full search of

4  the person [arrested] is not only an exception to the warrant requirement of the

5  Fourth Amendment, but is also a 'reasonable' search under that Amendment."

6  *United States v. Robinson*, 414 U.S. 218, 235 (1973).  Indeed, a search incident to

7  arrest is lawful even where the officer has no present intention of booking the

8  suspect.  *In re Demetrius A.*, 208 Cal.App.3d 1245, 1248 (1989).

9    35.    Fouste arrested Plaintiff on probable cause of marijuana possession.

10  Accordingly, the search of his person was reasonable under the Fourth

11  Amendment.

12    36.    Even if, for purposes of argument only, Plaintiff was not arrested

13  until he was handcuffed shortly after the search, it still was a constitutional search

14  incident to arrest, because there was probable cause independent of the fruits of

15  the search, and the arrest followed quickly on the heels of the search.  *Rawlings v.*

16  *Kentucky*, 448 U.S. 98, 110-111 n. 6 (1980).

17    37.    And, even if the search violated the Fourth Amendment, though it

18  did not, a reasonable officer in Fouste's position could have believed the search

19  was reasonable.  For that reason as well, Fouste is entitled to qualified immunity

20  for Plaintiff's unreasonable search-related claims.

21    38.    Hergesheimer's search of Plaintiff was similarly reasonable as he

22  took custody of Plaintiff, Plaintiff remained under arrest, and the original search

23  was conducted by Fouste, who was no longer at the scene

24    39.    "[W]here there was probable cause to search a vehicle 'a search is

25  not unreasonable if based on facts that would justify the issuance of a warrant,

26  even though a warrant has not been actually obtained.'"  *Maryland v. Dyson*, 527

27  U.S. 465, 467 (1999) (quoting, *United States v. Ross*, 456 U.S. 798, 809 (1982)).

28  "If a car is readily mobile and probable cause exists to believe it contains

DEFENDANTS' SEPARATE STATEMENT

contraband, the Fourth Amendment ... permits police to search the vehicle without more." *Id.* (quoting, *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)).

40.    Probable cause existed to believe that the vehicle contained more contraband, and the Range Rover was readily mobile.  As a result, the search of the vehicle was a valid and lawful "automobile search" that did not violate the Fourth Amendment.

41.    In addition, even if the search violated the Fourth Amendment, which it did not, a reasonable officer could have believed the search was justified as an "automobile search."  For that reason as well, Defendants are entitled to qualified immunity as to Plaintiff's claims related to the search of the car.

42.    A search incident to the lawful arrest of a recent occupant of an automobile may include the passenger compartment of the automobile where it is reasonable to believe that evidence of the offense of arrest is in the vehicle. *Arizona v. Gant*, __ U.S.__, 129 S.Ct. 1710, 1723 (2009); *see also*, *Thornton v. United States*, 541 U.S. 615, 629-31 (2004) (Scalia, J., concurring).

43.    "[C]ircumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.' [Citation].  In [... cases], including [*New York v. Belton*, 453 U.S. 454 (1981) (possession of marijuana)] and *Thornton* [*supra*, (possession of marijuana and cocaine)], the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Gant*, 129 S.Ct at 1719 (citations omitted).

44.    Plaintiff's offense of arrest (possession of marijuana) and his actual possession of marijuana supplied the basis for searching the passenger compartment of his vehicle.  Therefore, the search of the Range Rover was a lawful search incident to arrest, and did not violate the Fourth Amendment.

45.    In addition, even if the search violated the Fourth Amendment, which it did not, a reasonable officer could have believed the search was a lawful

1   search incident to arrest.  For that reason as well, Defendants are entitled to

2   qualified immunity as to Plaintiff's claims related to the vehicle search.

3        46.    Based on the amount of marijuana, Plaintiff would not have been

4   taken to jail for booking if he had satisfactory evidence of identity and agreed to

5   appear in court.  Health & Safety Code § 11357(b).

6        47.    Based on the information known to Prince, there was probable cause

7   to believe Plaintiff violated the court order, a misdemeanor.  Penal Code §

8   166(a)(4).  As a result, the decision to transport Plaintiff to jail for booking did

9   not violate the Fourth Amendment.

10       48.    Furthermore, a reasonable officer in his position could have

11  reasonably believed that the decision to arrest and book Plaintiff for violation of

12  Penal Code § 166(a)(4) was justified.  For that reason as well, Defendants are

13  entitled to qualified immunity for Plaintiff's unreasonable seizure-related claims.

14       49.    Under the Fourth Amendment, "the right to make an arrest or

15  investigatory stop necessarily carries with it the right to use some degree of

16  physical coercion or threat thereof to effect it."  *Graham v. Connor*, 490 U.S. 386,

17  396 (1989).  A court must consider "the severity of the crime at issue, whether the

18  suspect poses an immediate threat to the safety of the officers or others, and

19  whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

20  "The reasonableness of a particular use of force must be judged from the

21  perspective of a reasonable officer on the scene, rather than the 20/20 vision of

22  hindsight.  *Id.*  Indeed, "[t]he calculus of reasonableness must embody allowance

23  for the fact that police officers are often forced to make split-second judgments-in

24  circumstances that are tense, uncertain, and rapidly evolving-about the amount of

25  force that is necessary in a particular situation."  *Id.* at 396-97.

26       50.    Indeed, "[n]ot every push or shove, even if it may later seem

27  unnecessary in the peace of a judge's chambers… violates the Fourth

28  Amendment.  The calculus of reasonableness must embody allowance for the fact

DEFENDANTS' SEPARATE STATEMENT

1    that police officers are often forced to make split-second judgments-in

2    circumstances that are tense, uncertain, and rapidly evolving-about the amount of

3    force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97

4    (internal quotation omitted).

5        51.   California courts apply the same analysis to related state claims of

6    assault and battery by police officers, and the burden is on the plaintiff to

7    demonstrate the force used was unreasonable. *Edson v. City of Anaheim*, 63

8    Cal.App.4th 1269, 1272 (1998).

9        52.   The situation facing Prince, Hilliard, and Hergesheimer constituted a

10   paradigm of "circumstances that are tense, uncertain, and rapidly evolving."

11   *Graham*, 490 U.S. at 396-97. Therefore, the "split-second judgments" to use

12   force and to apply the Taser to subdue Plaintiff were not unreasonable.

13       53.   Moreover, a reasonable officer in the Defendants' position could

14   have reasonably believed that the force used against Plaintiff, including the one

15   five-second "drive stun" application of the Taser, was reasonable and justified.

16   For that reason as well, the individual Defendants are entitled to qualified

17   immunity for Plaintiff's unreasonable force claims related to the Paseo De

18   Colinas incident.

19       54.   The individual Defendants did not use unreasonable force in

20   removing Plaintiff from the patrol car and by carrying him by his arms and legs.

21       55.   Moreover, a reasonable officer in Defendants' position could

22   reasonably have believed that such actions were reasonable. Indeed, in the

23   seminal case of *Saucier v. Katz*, the defendant and another officer carried the

24   plaintiff away from a demonstration by his arms. *Saucier*, 533 U.S. at 198. The

25   Supreme Court determined that the defendant was entitled to qualified immunity

26   because there was no clearly established law that the use of force was prohibited.

27   *Id.* at 209. Similarly, Plaintiff cannot meet his burden of showing clearly

28   established law prohibited Defendants' extraction and carrying of Plaintiff. For

1   this reason as well, Defendants are entitled to qualified immunity with regard to

2   Plaintiff's removal from the patrol car and carrying into the jail, and to the

3   medical observation cell.

4       56.    Jail personnel must be allowed to employ reasonable and limited

5   physical actions to complete these procedures in the jail setting, especially when

6   dealing with persons who may be intoxicated and assaultive, and who are not

7   complying with orders.

8       57.    Furthermore, even if the control holds used by Hernandez, Foster,

9   Garcia, and Padilla caused some pain, their use was objectively reasonable and a

10   reasonable officer could conclude that they were reasonable. *See, Eberle v. City*

11   *of Anaheim*, 901 F.2d 814, 819-20 (9th Cir. 1990) (use of a finger-hold

12   to prevent belligerent football fan from entering altercation between another

13   individual and officers was objectively reasonable); *Forrester v. City of San*

14   *Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (use of "pain compliance techniques" to

15   remove demonstrators blocking access to an abortion clinic was objectively

16   reasonable).  At the very least, the alleged actions of Hernandez, Foster, Garcia,

17   and Padilla cannot be said to have violated clearly established Fourth Amendment

18   law.

19       58.    A plaintiff must establish a § 1983 defendant's personal participation

20   in a constitutional deprivation, or a causal connection between the defendant's

21   conduct and the deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir.

22   1978); *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989); *Rizzo v. Goode*,

23   423 U.S. 362, 374-77 (1976) (rejecting city officials liability under § 1983 absent

24   a showing of "direct responsibility").

25       59.    The supervisor liability claims against Fouste and Essoe fail.

26       60.    To the extent Plaintiff's "bystander" claims are based on an alleged

27   failure to intercede to prevent a search, seizure, or use of force, the claim fails

28   because those actions were reasonable and lawful. *Cunningham v. Gates*, 229

F.3d 1271, 1289 (9th Cir. 2000).

61.    In addition, even assuming Plaintiff's constitutional rights were violated, liability for failing to intercede attaches only where a defendant has a realistic opportunity to intercede. *Id.* at 1289-90.

62.    In this case, Fouste had arrested and searched Plaintiff before other Defendants arrived on the scene. Accordingly, no other Defendant can be liable under a failure to intercede theory for Plaintiff's search and seizure claims.

63.    Second, Fouste and Kunar left the scene before the alleged use of excessive force at Paseo De Colinas. (SS 45-53) Therefore, they cannot be liable under such a theory for Plaintiff's excessive force claim.

64.    Third, when Prince tased Plaintiff, Hergesheimer had gone to retrieve ankle cuffs, so he had no reasonable opportunity to intercede.

65.    Similarly, after Plaintiff left the triage counter, Hergesheimer was no longer in contact with Plaintiff and did not observe his diversion to the medical observation cell. (SS 81-89) As a result, Hergesheimer cannot be liable under a failure to intercede theory for those events either.

66.    In any event, a reasonable officer could conclude that the Defendants' actions were not unconstitutional under a supervisory or bystander theory of liability. Accordingly, Defendants are entitled to qualified immunity.

67.    In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that "by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994). Intent to inhibit speech is an element of the claim. *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999).

///

///

68.    To the extent the extraction and carrying was based on Plaintiff's literal speech, it was at his behest, and not a response to chill First Amendment activity.

69.    There was no violation of Plaintiff's First Amendment rights.

70.    Moreover, the individual Defendants are entitled to qualified immunity because a reasonable officer in their position could reasonably have concluded that their actions did not violate the First Amendment.

71.    There is no separate, cognizable claim for conspiracy under § 1983. Rather, claims of conspiracy are only another way of alleging defendants' participation in an underlying constitutional violation.  The elements of conspiracy for § 1983 are: (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement.  *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991) (Bivens action, the federal counterpart of a § 1983 action).  The plaintiff must show an agreement or meeting of the minds to commit a constitutional violation.  *Woodrum v. Woodward County, Okl.*, 866 F.2d 1121, 1126 (9th Cir. 1989).  A plaintiff must show specific, material facts that support his claim of conspiracy.  *Id.*; *Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989).

72.    Plaintiff's claims of conspiracy fail.

73.    An immunity provision of the California Government Claims Act generally prevails over a liability provision.  *Allyson v. Department of Transp.*, 53 Cal.App.4th 1304, 1313, 1318 (1997).  In *Caldwell v. Montoya*, 10 Cal.4th 972 (1995), the California Supreme Court held that public employees' statutory immunities prevail over statutes generally imposing liability unless there is "a clear indication of legislative intent that statutory immunity is withheld or withdrawn in the particular case."  *Id.* at 986.  "Stated differently, the general rule is that the governmental immunity will override a liability created by a statute

45
DEFENDANTS' SEPARATE STATEMENT

outside of the [Government] Claims Act.  Further, unless an immunity otherwise provides, the governmental tort immunities apply to intentional tortious conduct." *Gates v. Superior Court*, 32 Cal.App.4th 481, 510 (1995).  Indeed, statutory immunities also prevail over claims arising under the State Constitution. *Richardson-Tunnell v. School Ins. Program for Employees*, 157 Cal.App.4th 1056, 1066 (2007).

74.　Government Code § 821.6 immunizes public employees from liability for injuries "caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."

75.　The scope of § 821.6 "extends to actions taken in preparation for formal proceedings.  Because investigation is 'an essential step' toward the institution of formal proceedings, it 'is also cloaked with immunity.'"  *Amylou R. v. County of Riverside*, 28 Cal.App.4th 1205, 1209-10 (1994).  This immunity has been expanded from protecting only against malicious prosecution to immunize against a variety of torts.  *See*, *Id.* (intentional infliction of emotional distress), *Gates v. Superior Court*, 32 Cal.App.4th 481 (1995) (violations of civil rights under Civil Code §§ 52 and 52.1), and *Johnson v. City of Pacifica*, 4 Cal.App.3d 82 (1970) (negligence).  The primary justification in expanding the scope of § 821.6 is the important public interest in criminal investigation.  *Blackburn v. County of Los Angeles*, 42 Cal.App.3d 175, 178 (1974), ("[w]hen the duty to investigate crime and to institute criminal proceedings is lodged with any public officer, it is for the best interests of the community as a whole that [the officer] be protected from harassment in the performance of that duty.").

76.　Accordingly, as the Defendants were investigating Plaintiff's involvement in possible criminal activity at Paseo De Colinas, they are entitled to Government Code § 821.6 immunity against Plaintiff's state law claims related to their actions during their investigation.

77.     Even if one or more Defendants violated state law, no other Defendants can be held liable.  Government Code § 820.8 provides in pertinent part: "a public employee is not liable for an injury caused by the act or omission of another person."  Govt. Code § 820.8.  Moreover, this immunity even applies to supervisors such as Fouste and Essoe.  *Milton v. Nelson*, 527 F.2d 1158, 1159 (9th Cir. 1975) ("[S]upervisory personnel whose personal involvement is not [proved] may not be held responsible for the acts of their subordinates under California law.").

78.     Negligent infliction of emotional distress is not an independent tort. *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984 (1993).  The tort is simply negligence. *Id.*

79.     Plaintiff has already pled negligence as the Eleventh Cause of Action, so Plaintiff's Twelfth Cause of Action for negligent infliction of emotional distress fails to state a claim for relief.  Accordingly, this Court should grant Defendants summary adjudication of Plaintiff's Twelfth Cause of Action.

DATED: March 1, 2010          Respectfully submitted,

LAWRENCE BEACH ALLEN, & CHOI, PC

By _____

DAVID D. LAWRENCE
CHRISTINA M. SPRENGER
DANIEL S. CHA
Attorneys for Defendants,
COUNTY OF ORANGE, SEAN
HILLIARD, JAMES FOUSTE, JARRETT
KURIMAY, DAVID HERNANDEZ,
CYRIL FOSTER, MANUEL GARCIA,
MICHAEL PADILLA, IRA ESSOE,
MARK HERGESHEIMER, MARK
KUNAR, MATTHEW PRINCE and
MICHAEL CARONA

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA; COUNTY OF ORANGE

3

      I, Debbie Pryor, am employed in the aforesaid County, State of California;
I am over the age of 18 years and not a party to the within action; my business
address is 1600 North Broadway, Suite 1010, Santa Ana, California 92706.

4

5

      On March 1, 2010, I electronically filed the foregoing **DEFENDANTS
JAMES FOUSTE'S, SEAN HILLIARD'S, MATTHEW PRINCE'S, MARK
KUNAR'S, MARK HERGESHEIMER'S, IRA ESSOE'S, MICHAEL
PADILLA'S, MANUEL GARCIA'S, CYRIL FOSTER'S, DAVID
HERNANDEZ'S, AND JARRETT KURIMAY'S SEPARATE
STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS
OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT/SUMMARY ADJUDICATION** with the Clerk of the Court using
the CM/ECF system which will send notification of such filing to the following e-
mail addresses:

6

7

8

9

10

11

1.    Jerry L. Steering, Esq.      jerrysteering@yahoo.com
2.    Carol E. Lavacot, Esq.      law@lavacot.com

12

13

___    BY MAIL:  I am "readily familiar" with the firm's practice of collection
and processing correspondence for mailing.  Under that practice, it would
be deposited with the U.S. Postal Service on that same day with postage
thereon fully prepaid at Santa Ana, California, in the ordinary course of
business.

14

15

16

___    BY FEDERAL EXPRESS
I caused such envelope to be delivered via Federal Express to the offices of
the address(es) listed above.

17

18

19

___    BY PERSONAL SERVICE

20

21

      __    I hand delivered such envelope by hand to the
addressee(s) listed above.

22

23

__X__    (Federal) I declare under penalty of perjury under the laws of the United
States of America that the foregoing is true and correct.

24

25

Executed on March 1, 2010 at Santa Ana, California

26

27

_____
Declarant

28

48
DEFENDANTS' SEPARATE STATEMENT