1  Jerry L. Steering; SBN 122509
   Law Office of Jerry L. Steering
2  4063 Birch Street
   Suite 100
3  Newport Beach, CA 92660
   (949) 474-1849
4  (949) 474-1883 Fax
   e-mail: info@steeringlaw.com
5
   Carol E. Lavacot; SBN 101689
6  Law Offices of Carol E. Lavacot
7  Irvine Center Towers
8  18500 Von Karman Avenue
   Suite 560
9  Irvine, CA, 92612
10 (949) 476-9000
   Fax: (949) 476-0900
11 e-mail: law@lavacot.com
12
   Attorneys for Plaintiff Joshua Rashid Radwan
13
14            UNITED STATES DISTRICT COURT
15          CENTRAL DISTRICT OF CALIFORNIA
16 JOSHUA RASHID RADWAN,           )  Case No.  SACV 08-786 AG
17                                 )  (ANx)
        Plaintiff,                 )
18                                 )  PLAINTIFF'S AMENDED
19   vs.                           )  STATEMENT OF
                                   )  GENUINE MATERIAL
20 COUNTY OF ORANGE, MICHAEL       )  ISSUES OF FACTS IN
21 CARONA, JAMES FOUSTE, SEAN      )  DISPUTE IN OPPOSITION
22 HILLIARD, MATTHEW PRINCE,       )  TO DEFENDANT
   MARK KUNAR, MARK                )  COUNTY OF ORANGE'S
23 HERGESHEIMER, IRA ESSOE,        )  MOTION FOR SUMMARY
24 MICHAEL PADILLA, MANUEL         )  JUDGMENT / SUMMARY
   GARCIA, CYRIL FOSTER, THOMAS    )  ADJUDICATION OF
25 STREETER, DAVID HERNANDEZ,      )  ISSUES
26 JARRETT KURIMAY and DOES 1      )
27 through 10, inclusive,          )  DATE:  APRIL 19, 2010
                                   )
28      Defendants.                )  TIME:  10:00 A.M.
   _____ )

       AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE
                              1

CTRM: 10D

JUDGE ANDREW J. GUILFORD

**COMES NOW** plaintiff Joshua Rashid Radwan and shows this honorable court his Statement of Genuine Material Issues Of Facts In Dispute In Opposition To Defendant's Motion For Summary Judgment / Summary Adjudication, as follows:

| DEFENDANTS' CLAIMED UNDISPUTED MATERIAL FACTS: | PLAINTIFF'S POSITION ON DEFENDANTS' CLAIMED UNDISPUTED MATERIAL FACTS, AND SUPPORTING EVIDENCE: |
|---|---|
| 1.     On December 23, 2006, Joshua Radwan and his girlfriend, Cassandra Fults, left Mission Viejo Mall in his Range Rover; Radwan had pepper spray and marijuana on his person. | 1.  Undisputed for the purposes of this instant motion. |
| 2.     On the way home, Radwan and Fults got into an argument. | 2.     **Partially Disputed.** Cassandra Fults and the plaintiff were arguing, but Cassandra Fults also became upset about a private matter and she started crying about everything. Deposition of plaintiff Joshua Rashid Radwan, Volume Two of December 24, 2009 ("JOSHUA DEPO") 90:11-21; 91:23-92:6; See Declaration of Plaintiff Joshua Radwan in Opposition to Defendants' Motion for Summary Judgment / Summary Adjudication of Issues ("JOSHUA DECL") ¶¶ 8, 19 -21. |
| 3.     Radwan pulled his Range Rover into the driveway of a school at Paseo De Colinas, near Del Cerro. | 3.     **Undisputed for the purposes of this instant motion.** |
| 4.     Radwan and Fults got out of the car and were standing and | 4.     **Undisputed for the purposes of this instant motion.** |

| | |
|---|---|
| sitting next to it. | |
| 5.    Radwan kicked the tire of his Range Rover while talking to Fults. | 5.    **Undisputed for the purposes of this instant motion.** |
| 6.    Fults was crying hysterically. | 6.    **Undisputed for the purposes of this instant motion.** |
| 7.    On December 23, 2006, at approximately 9:30 p.m., Sergeant Fouste, Deputy Hilliard, Deputy Prince and Deputy Kunar were working on patrol and heard a call over the dispatch radio requesting deputies respond to the area of Paseo De Colinas in Laguna Niguel regarding a report that a person was being kicked by another person next to a Range Rover. | 7.    **Undisputed for the purposes of this instant motion.** However, the motorist saw that made the anonymous 911 call to the Orange County Sheriff's Department, only stated that she had seen some kicking, and had seem someone on the ground; she never said that she saw a man kicking a woman. See Separately Filed Exhibit "M" (transcript of 911 call / OCSD radio communications), p.3. |
| 8.    Sergeant Fouste was the first patrol car to arrive at Paseo De Colinas near Del Cerro, and saw Radwan's Range Rover parked in a driveway for a school. | 8.    **Undisputed for the purposes of this instant motion.** |
| 9.    Sergeant Fouste saw Radwan and a woman, later identified as Cassandra Fults, next to the Range Rover. | 9.    **Undisputed for the purposes of this instant motion.** |
| 10.    Sergeant Fouste exited his patrol vehicle and asked Radwan to approach him by walking backwards towards him. | 10. **Partially disputed.**  After driving-up to the scene and getting out of his patrol car, defendant Sgt. Fouste stated to plaintiff that he had reports that a man is kicking a person, and plaintiff told defendant Sgt. Fouste that he did not kick Miss Fults. Sgt. Fouste subsequently ordered plaintiff to come over to him, and to then turn around and to place his hands behind his back, which he did; exactly as ordered by |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

3

| | |
|---|---|
| | defendant Fouste. JOSHUA DECL ¶¶ 22-23. See also, Separately Lodged Exhibit "B"; copy of the Patrol Video System recording of defendant OCSD Deputy Sheriff Sean Hilliard ("HILLIARD VIDEO") of December 23, 2006 at 22:45:23 hours (time shown on video recording); (00:02) time shown on Windows Media Player Counter time); See also, Separately Lodged Exhibit "C"; copy of the Patrol Video System recording of defendant OCSD Sgt. James Fouste of December 23, 2006 ("FOUSTE VIDEO") at 22:30:58 (time shown on video recording); 00:58; time shown on Windows Media Player Counter time). |
| 11.   After he approached, Sergeant Fouste smelled the odor of unburned marijuana on Radwan's person. | **11. Disputed.**  First, plaintiff had only a small amount of marijuana (about a teaspoon size amount) that was unburned, and was sealed in a plastic container; preventing a person from being able to smell the small amount of marijuana at night, in the cold, on December 23, 2006, inside of plaintiff's pocket. JOSHUA DECL ¶¶ 23-28. Second, defendant Sgt. Fouste made no comment about smelling marijuana until after he had searched plaintiff and had emptied out plaintiff's pockets, and after plaintiff had been ordered by Sgt. Fouste to walk over to a wall, where plaintiff was then sitting when he made that statement to plaintiff. JOSHUA DEPO 110:11-111:12; JOSHUA DECL ¶ 29.  Third, in defendant Prince's Exhibit "J"; true and correct copy of Prince's "Crime Summary Information, Probable Cause Declaration, Bail Setting Information" declaration of December 23, 2006, p.1, Separately filed Exhibit "J", he states that defendant Fouste's search of the |

plaintiff was a "consent search". Prince also claims that defendant Sgt. Fouste's search of the plaintiff was a "consent search" of the plaintiff. See Separately Filed Exhibit "H"; Prince's Initial Crime Report of December 24, 2006. Prince also testified in his deposition that Sgt. Fouste told him that he had obtained consent from the plaintiff to search him upon his initial contact with him. See, Separately filed Exhibit "U", Deposition of defendant Matthew Prince of February 22, 2010 ("PRINCE DEPO II") pp. 68:22-71:5.

Defendant Sergeant Fouste's pattern of dishonesty was also shown when Sergeant Fouste was a defendant in a case in 2001 involving then plaintiff, Cory Baima (*Cory Baima v. County of Orange, George Kluchonic, James Fouste, Monte Huotari, David Cappel, and Does 1 through 10, inclusive*; SACV-01-710 DOC (ANx)). That case involved Sergeant Fouste, then Deputy Fouste, falsely arresting and using unreasonable force on plaintiff Cory Baima. Defendant Fouste had his microphone on during most of his encounter with Mr. Baima. However, after torturing Mr. Baima, Defendant Fouste realizes that he forgot to turn his microphone off during the torturing of Mr. Baima and quickly turns his microphone off (See Exhibit "UU"; copy of defendant James Fouste's patrol video system tape on February 13, 2001, Windows Media Player time 05:04). Defendant Fouste identified himself in the video during his deposition for this litigation (Exhibit "EEEEE"; excerpt of the deposition of defendant James Fouste of December 31, 2009; p. 5:18-25; also See Exhibit "AAA"; excerpt from defendant

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

5

| | |
|---|---|
| | Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, 117: 16-25, 118: 1-11; also see Exhibit "DDDDD"; excerpt of the deposition of defendant James Alain Fouste of January 3, 2004; pp. 9:1-10:22.).  Realizing that he had just audio recorded himself torturing Mr. Baima, Defendant Sergeant Fouste states, "I think my mic's on" and quickly turns off his microphone (See Exhibit D; copy of defendant James Fouste's patrol video system tape on February 13, 2001, Windows Media Player time 05:04.  See also Exhibit "SS"; Transcript of a Conversation between Defendant Deputy Fouste and Baima, February 13, 2001, pg.5) Defendant Fouste states in his report that, "Baima attempted to pull away from Kluchonic and resisted his efforts to handcuff him . . . . Even though Baima was handcuffed, we were unable to safely search him because he was still being uncooperative."  Defendant Fouste also states in his report that Mr. Baima was refusing to put his hands up when instructed to do so (See Exhibit "TT"; copy of Orange County Sheriff's Department Deputy Fouste's Initial Crime Report, Case No. 01-0031144). |
| 12.   Sergeant Fouste informed Radwan that he smelled the odor of marijuana on his person. | 12.  **Undisputed.** However, First, plaintiff had only a small amount of marijuana (about a teaspoon size amount) that was unburned, and was sealed in a plastic container; preventing a person from being able to smell the small amount of marijuana at night, in the cold, on December 23, 2006, inside of plaintiff's pocket. JOSHUA DECL ¶¶ 23-28. Second, defendant Sgt. Fouste made no comment about smelling marijuana until after he had |

searched plaintiff and had emptied out plaintiff's pockets, and after plaintiff had been ordered by Sgt. Fouste to walk over to a wall, where plaintiff was then sitting when he made that statement to plaintiff. JOSHUA DEPO 110:11-111:12; JOSHUA DECL ¶ 29. Third, in defendant Prince's Exhibit "J"; true and correct copy of Prince's "Crime Summary Information, Probable Cause Declaration, Bail Setting Information" declaration of December 23, 2006, p.1, Separately filed Exhibit "J", he states that defendant Fouste's search of the plaintiff was a "consent search". Prince also claims that defendant Sgt. Fouste's search of the plaintiff was a "consent search" of the plaintiff. See Separately Filed Exhibit "H"; Prince's Initial Crime Report of December 24, 2006. Prince also testified in his deposition that Sgt. Fouste told him that he had obtained consent from the plaintiff to search him upon his initial contact with him. See, Separately filed Exhibit "U", Deposition of defendant Matthew Prince of February 22, 2010 ("PRINCE DEPO II") pp. 68:22-71:5.

Moreover, defendant Fouste admits in his deposition that he asked for (while defendant Fouste was holding plaintiff's hands in back of him), but was denied by plaintiff, consent to search plaintiff's person, and that he made a full blown invasive search of the plaintiff nonetheless. See, Separately Filed Exhibit "S"; Excerpt of Declaration of Deposition of defendant James Fouste of December 31, 2009 ("FOUSTE DEPO"); pp. 59:6-62:10.

Moreover, defendant Fouste not only claims that he did not author a patrol Sergeant's Activity Report for December

AMENEDED STATEMENT OF MATERIAL FACTS IN DISPUTE

7

| | |
|---|---|
| | 23, 2006, but also, that he was not required to do so by Orange County Sheriff's Department policies then in existence. See Separately Filed Exhibit "XX", Excerpt of Declaration of Deposition of defendant James Fouste of December 31, 2009; pp. 16:13-24, also See Separately Filed Exhibit "QQQQ", Excerpt of Deposition of defendant James Fouste of December 31, 2009; pp. 20:05 -24:07.<br><br>     Moreover, defendant Fouste did not have his remote Patrol Video System microphone **on** during the December 23, 2006 incident, that would have recorded the discussions that he had with the plaintiff, although his remote microphone was apparently functioning, and apparently defendant Fouste turned his remote microphone on after he left the scene of the incident with the plaintiff. See Exhibit "C"; copy of the Patrol Video System recording of defendant OCSD Sgt. James Fouste of December 23, 2006 ("FOUSTE VIDEO") at Windows Media Player time 05:04.) |
| 13.   Sergeant Fouste grabbed Radwan's hands behind his back and searched his person. | 13. Undisputed for the purposes of this instant motion. |
| 14.   Deputy Hilliard was the second patrol car to arrive at the scene, after Sergeant Fouste and immediately before Deputy Prince. | 14. Undisputed for the purposes of this instant motion. |
| 15.   Deputy Prince was the third patrol car to arrive at Paseo De Colinas, after Sergeant Fouste and immediately after Deputy Hilliard. | 15.   Undisputed for the purposes of this instant motion. |
| 16.   Fults was crying loudly. | 16.   Undisputed for the purposes of this instant motion. |
| 17.   Pursuant to Sergeant Fouste's search of Radwan, he discovered a | 17.   Undisputed for the purposes of this instant motion. |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

8

| | |
|---|---|
| clear plastic container containing approximately one tablespoon of marijuana and a canister of pepper spray. | |
| 18.   Sergeant Fouste ordered Radwan to sit next to a nearby wall to separate him from Fults, so that other deputies who had arrived on the scene could continue investigating the initial report. | **18.   Undisputed for the purposes of this instant motion.** |
| 19.   Deputy Kunar was the fourth patrol car to arrive at Paseo De Colinas, after Sergeant Fouste, Deputy Hilliard, and Deputy Prince. | **19.   Undisputed for the purposes of this instant motion.** |
| 20.   Deputy Kunar stood by as backup for the other deputies. | **20.   Undisputed for the purposes of this instant motion.** |
| 21.   For the most part, Deputy Kunar was responsible for keeping an eye on the patrol vehicles. | **21.   Undisputed for the purposes of this instant motion.** |
| 22.   Deputy Prince was the handling deputy. | **22.   Undisputed for the purposes of this instant motion.** |
| 23.   Deputy Prince conducted a search of Radwan's vehicle. | **23.   Undisputed for the purposes of this instant motion.** |
| 24.   Deputy Prince found three (3) knives in Radwan's vehicle. | **24.   Undisputed for the purposes of this instant motion.** |
| 25.   Two of the knives' blades were 6", 4", and the other knife was approximately 4" when it was folded. | **25.   Undisputed for the purposes of this instant motion.** |
| 26.   At least one of the knives was in a condition that indicated that it had been practiced as a throwing knife. | **26.     Disputed. JOSHUA DECL ¶ 9.** |
| 27.   Then, at Deputy Prince's direction, Deputy Hilliard searched the rear of Radwan's Range Rover for additional contraband, such as | **27.   Undisputed for the purposes of this instant motion.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

9

| | |
|---|---|
| marijuana. | |
| 28.   At one point, Sergeant Fouste ordered Radwan up to his feet, handcuffed him, and had him placed in a patrol vehicle. | 28.   **Undisputed for the purposes of this instant motion.** |
| 29.   After Radwan had been placed inside a patrol car, Deputy Kunar conducted a visual search of Radwan's car. | 29.   **Undisputed for the purposes of this instant motion.** |
| 30.   Deputy Kunar then briefly assisted Deputy Hilliard search the back cargo area of Radwan's Range Rover. | 30.   **Undisputed for the purposes of this instant motion.** |
| 31.   Deputy Prince gave Deputy Hilliard Radwan's identifying information and he ran a records check on Radwan through his patrol car's mobile computer terminal. | 31.   **Undisputed for the purposes of this instant motion.** |
| 32.   Deputy Hilliard determined that Radwan was subject to a court-issued protective order; one database showed that the court order prohibited Radwan from possessing any weapons. | 32.   **Undisputed for the purposes of this instant motion.** |
| 33.   Another database listed that Radwan was not to possess any firearms pursuant to that court order. | 33.   **Undisputed for the purposes of this instant motion.** |
| 34.   Deputy Hilliard informed Deputy Prince of the existence of the court order and the fact that one database showed that Radwan was not to possess any weapon whereas another database showed only that Radwan was not to possess any | 34.   **Disputed.** Defendant Prince says in his report that plaintiff subject to protective order prohibiting him from possessing any weapons at all, but doesn't mention the other database printout (the one from the California Department of Justice Domestic Violence Restraining Order System |

| | |
|---|---|
| firearm. | ["DVROS"][1]) that only prohibits the plaintiff from possessing any firearms, or any effort to reconcile the disparity between the two reports. See Separately Filed Exhibit "H"; true and correct copy of defendant Prince's Initial Crime Report of December 24, 2006 ("PRINCE CRIME REPORT"); See also, Separately Filed Exhibit "I"; true and correct copy of Prince's Daily Activity Report ("DAR"), that also mentions nothing about the CLETS database that only says no firearms, and only claims that he learned that plaintiff was enjoined from possessing any type weapon. See also, Separately Filed Exhibit "J"; true and correct copy of Prince's "Crime Summary Information, Probable Cause Declaration, Bail Setting Information" declaration (signed under penalty of perjury) that states only that plaintiff was enjoined from possessing any type weapons, and mentions nothing about the CLETS database that only says no firearms; See also, Separately Filed Exhibit "K"; true and correct copy of the subject Protective Order In Criminal Case, that has a boiler plate provision that the defendant / restrained party must surrender (dispossess himself of) all firearms, and mentions nothing about any other weapons. |
| 35.   Deputy Prince contacted "Control One" (custodian of Orange County-based restraining orders) regarding the possible inconsistency between the | 35.   **Disputed.** In his deposition (second session, of February 22, 2010; "PRINCE DEPO II"), defendant Prince testified, *inter alia*: 1) that the actual Orange County Superior Court issued Protective Order in a |

---

[1] All protective orders and restraining orders are run through the database through the California Department of Justice Domestic Violence Restraining Order System ["DVROS"].

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

| | |
|---|---|
| databases and whether the pepper spray and knives fell under the provision of "other weapons." | Criminal Case over which he arrested the Plaintiff during the December 23, 2006 incident complained of in this action only prohibited the plaintiff from possessing a firearm; 2) that he knew of the conflicting orders; 3) that he didn't think that one of the orders was "right" and that one was "wrong", 4) that he believed that the plaintiff **may** have been restrained from prohibiting any weapons at all, because of the nature of the charges in the underlying criminal action from which the protective order issued; 5) that he claims that he asked the plaintiff about the protective order, who told him that the whole thing was just a mistake and not to worry about it. Defendant Prince makes no mention whatsoever of any effort to contact the "Control One" mentioned in his declaration, that supposedly could not shed any light on the issue of the discrepancy between the two orders. See attached Exhibit "L", excerpt of the deposition of defendant Matthew Prince of February 22, 2010 ("PRINCE DEPO II"); pp. 124:14 - 131:9. See also, Exhibit "M"; copy of a transcript of the Orange County Sheriff's Department 911 telephone and radio communications that were produced by the Orange County Sheriff's Department / County of Orange to plaintiff (in the underlying criminal action), that is completely absent of any inquiry about the subject Criminal Case Protective Order that the plaintiff was arrested for the violation of on December 23. 2006 during the incident complained of. The transcript makes no mention whatsoever of any effort to contact the "Control One" mentioned in defendant Prince's declaration in support of |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE
12

this instant motion, that supposedly could not shed any light on the issue of the discrepancy between the two orders. Moreover, the Criminal Case Protective Order states not to rely on either the CLETS or the NCIC printout in deciding to arrest or detain based on the restrained person, and to contact " the Control One supervisor at 724-647-4587" at the Orange County Sheriff's Department giving the telephone number) to check on the protective order. See, Separately Filed Exhibit "N"; printout of the CLETS and the NCIC printouts of December 23. 2006.

Moreover, it is reasonable to assume that "Control One" would have had the correct information about the language of the protective order, as stated in the Criminal Case Protective Order (only no firearms), as both printouts state not to rely on either the CLETS or the NCIC printout and to contact Control One, as the Orange County Sheriff's Department is the agency with which the Criminal Case Protective Order was filed with, and as: "The primary function of Control One is to provide communication service and teletype system to all law enforcement and public service agencies within the County. Control One is the "point of contact" for requesting law enforcement, fire service, paramedics and other resources required for any incident." See Separately filed Exhibit "O"; printout from the Orange County Sheriff's Department's website (of March 29, 2010), explaining what "Control One" is and does. See also, Separately Filed Exhibit "U"; CD of 911 and Orange County Sheriff's Department Radio Transmissions of December 23, 2006 regarding the incident

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE
13

| | |
|---|---|
| | complained of in this action; the CD from which the transcript, Exhibit "M", was made. |
| 36.   "Control One" was unable to shed any light on either issue. | **36.   Disputed.** It makes no sense that a deputy sheriff would or could reasonably rely on a CLETS printout of a Criminal Case Protective Order that states not to rely on the printouts in deciding to arrest or detain the restrained party, and to contact the Control One Supervisor at the same police agency that the arresting officer is employed at, and that the Control One Supervisor couldn't shed any light on the order.

In his deposition (second session, of February 22, 2010; "PRINCE DEPO II"), defendant Prince testified, *inter alia*: 1) that the actual Orange County Superior Court issued  Protective Order in a Criminal Case over which he arrested the Plaintiff during the December 23, 2006 incident complained of in this action only prohibited the plaintiff from possessing a firearm; 2) that he knew of the conflicting orders; 3) that he didn't think that one of the orders was "right" and that one was "wrong", 4) that he believed that the plaintiff **may** have been restrained from prohibiting any weapons at all, because of the nature of the charges in the underlying criminal action from which the protective order issued; 5) that he claims that he asked the plaintiff about the protective order, who told him that the whole thing was just a mistake and not to worry about it. Defendant Prince makes no mention whatsoever of any effort to contact the "Control One" mentioned in his declaration, that supposedly could not shed any light on the issue of the discrepancy between the two orders. See |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

14

attached Exhibit "L", excerpt of the deposition of defendant Matthew Prince of February 22, 2010 ("PRINCE DEPO II"); pp. 124:14 - 131:9. See also, Exhibit "M"; copy of a transcript of the Orange County Sheriff's Department 911 telephone and radio communications that were produced by the Orange County Sheriff's Department / County of Orange to plaintiff (in the underlying criminal action), that is completely absent of any inquiry about the subject Criminal Case Protective Order that the plaintiff was arrested for the violation of on December 23. 2006 during the incident complained of. The transcript makes no mention whatsoever of any effort to contact the "Control One" mentioned in defendant Prince's declaration in support of this instant motion, that supposedly could not shed any light on the issue of the discrepancy between the two orders. Moreover, the Criminal Case Protective Order states not to rely on either the CLETS or the NCIC printout in deciding to arrest or detain based on the restrained person, and to contact " the Control One supervisor at 724-647-4587" at the Orange County Sheriff's Department giving the telephone number) to check on the protective order. See, Separately Filed Exhibit "N"; printout of the CLETS and the NCIC printouts of December 23. 2006.

Moreover, it is reasonable to assume that "Control One" would have had the correct information about the language of the protective order, as stated in the Criminal Case Protective Order (only no firearms), as both printouts state not to rely on either the CLETS or the NCIC printout and to contact Control One, as the Orange

AMENEDED STATEMENT OF MATERIAL FACTS IN DISPUTE

15

County Sheriff's Department is the agency with which the Criminal Case Protective Order was filed with, and as: "The primary function of Control One is to provide communication service and teletype system to all law enforcement and public service agencies within the County. Control One is the "point of contact" for requesting law enforcement, fire service, paramedics and other resources required for any incident." See Separately filed Exhibit "O"; printout from the Orange County Sheriff's Department's website (of March 29, 2010), explaining what "Control One" is and does. See also, Separately Filed Exhibit "U"; CD of 911 and Orange County Sheriff's Department Radio Transmissions of December 23, 2006 regarding the incident complained of in this action; the CD from which the transcript, Exhibit "M", was made.

Moreover, as explained below in greater detail, neither defendants Prince, nor Kunar nor Fouste nor Hilliard audio recorded any part of the December 23, 2006 incident complained of in this action, and none of them have any explanation for not having done so; notwithstanding the fact that Orange County Sheriff's Department policy and orders required them to have done so. See Separately filed Exhibit "V"; copy of Section 61 of the Orange County Sheriff's Department Operations and Procedures Manual, that was in effect on December 23, 2006. (See, Exhibit "BBB"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 16, 2009, 53:10 – 57:24; see also Exhibit "CCC"; excerpt from defendant Orange County Sheriff's

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

16

| | |
|---|---|
| | Deputy Prince's deposition of February 22, 2010, 120:16-121:12; see also Exhibit "DDD"; excerpt from defendant Orange County Sheriff's Deputy Prince's deposition of November 24, 2009, 11:21 – 19:01; see also Exhibit "EEE"; excerpt from defendant Orange County Sheriff's Deputy Kunar's deposition of November 17, 2009, 08:08 – 25:24, 39:14 – 46:17; see also Exhibit "FFF"; excerpt from defendant Orange County Sheriff's Deputy Hilliard's deposition of December 16, 2009, 28:04-13, 40:10-44:20, 96:22 – 100:06. |
| 37.   Sergeant Fouste spoke with Deputy Prince regarding the basis for taking Radwan to jail to be booked; he decided, and Sergeant Fouste approved of the decision to have Radwan taken to jail to be booked for being in violation of the court order. | 37.   **Undisputed for the purposes of this instant motion.** The CAD (Computer Assisted Dispatch) printout of the December 23, 2006 incident, Separately Filed Exhibit "P", shows defendant Sgt. Fouste ("4S40", or in police lingo, "Four Sam [for Sergeant] Forty") being at "Onscene" ("ONS") at 21:29:33 hours, and "Remaining" ("REM") at the scene of said incident until 23:03:54 hours (p.4 of Exhibit "P"). |
| 38.   Deputy Kunar did not consult with Deputy Prince as to whether or not Radwan should be taken to the jail and booked. | 38.   **Undisputed for the purposes of this instant motion.** |
| 39.   Deputy Prince had previously informed Radwan that he had been placed under arrest for possession of the marijuana that Sergeant Fouste had found, but that, if the investigation uncovered no more marijuana than Sergeant Fouste had found, he would likely be released with a citation. | 39. **Disputed.** Defendant Prince never told plaintiff that he was under arrest for possession of marijuana. JOSHUA DECL ¶ 31. Moreover, after defendant Fouste interrogated the plaintiff about whether any violence had taken place between the plaintiff and his girlfriend, Cassandra Fults, defendant Fouste told the plaintiff that he was detaining the plaintiff because of domestic violence laws; to check-out whether plaintiff's and Cassandra Fults' |

|  | stories checked-out. See, JOSHUA DECL, ¶ 32. Moreover, in PRINCE'S PROBABLE CAUSE DECL (Separately Filed Exhibit "J") and in PRINCE'S CRIME REPORT (Separately Filed Exhibit "H"), he only references telling the plaintiff that he was under arrest after learning about the protective order (that didn't restrain plaintiff from possessing the knives that defendant Prince arrested him for possessing), only after having discovered the knives in plaintiff's car, and only having discussed with plaintiff whether he knew about the protective order and whether he knew about the knives that were found in the plaintiff's car. |
|---|---|
| 40.   However, having determined that Radwan had likely violated a court order, Deputy Prince informed Radwan he was now under arrest for that charge as well. | 40.   **Disputed.** After defendant Fouste interrogated the plaintiff about whether any violence had taken place between the plaintiff and his girlfriend, Cassandra Fults, defendant Fouste told the plaintiff that he was detaining the plaintiff because of domestic violence laws; to check-out whether plaintiff's and Cassandra Fults' stories checked-out. See, JOSHUA DECL, ¶ 35. See also, Exhibit "YY" the Declaration of James Fouste filed by defendants in support of their instant motion for summary judgment ("FOUSTE DECL"), wherein defendant Fouste states that he only had plaintiff placed in the patrol car because plaintiff was allegedly "verbally uncooperative" and was "distracting" defendant Fouste from supervising the other deputies at the scene. FOUSTE DECL ¶ 16. Moreover, there is no evidence to support defendants' claim that Deputy Prince had determined that it was likely that the plaintiff had violated a protective order. As shown above, |

assuming, *arguendo*, that defendant Prince did what he said the he did in his declaration regarding the issue of whether the plaintiff was prohibited from possession any sort of weapon (something that the plaintiff shows is likely a recent fabrication by the defendants to justify plaintiff's arrest), defendant also admits that the database printout that shows that the plaintiff was only prohibited from possessing a firearm was from the state (of California) data base (page one of Separately Filed Exhibit "N"; Exhibit 7 of and attached to the deposition of defendant Matthew Prince of February 22, 2010; ("PRINCE DEPO II")), that the data base that showed that the plaintiff was enjoined from possessing any weapons at all was from a national data base known as the NCIC, that the two were different in that the state data base only showed plaintiff being prohibited from possessing firearms, that he didn't think that one of the data base printouts was wrong, and that he never asked the plaintiff about the difference between the two orders. See Exhibit "ZZ"; excerpt from the Deposition of Deputy PRINCE, Dated February 22, 2010;  125:11 – 130:4. Again, in neither, his PRINCE CRIME REPORT; See Exhibit "H"; Prince's Initial Crime Report of December 23, 2006; or in his PRINCE PROBABLE CAUSE DECL, See Exhibit "J"; true and correct copy of Prince's "Crime Summary Information, Probable Cause Declaration, Bail Setting Information" declaration of December 23, 2006 ; nor in his depositions, nor in his Daily Activity Report (Separately Filed Exhibit "I") does defendant Prince ever make any reference to contacting

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

19

| | |
|---|---|
| | "Control One" at the Orange County Sheriff's Department. Moreover, as shown above, the transcript of the Orange County Sheriff's Department radio communications in this action, Separately Filed Exhibit "M", shows no inquiry by defendant Prince or by anyone else, to the "Control One" department of the Orange County Sheriff's Department, or otherwise about the contours of the subject Criminal Case Protective Order. |
| 41.   Deputy Prince informed Radwan of his Miranda rights, which he acknowledged and waived. | **41.    Undisputed for the purposes of this instant motion.** |
| 42.   Radwan admitted that the knives Deputy Prince had found in the Range Rover were in his possession. | **42.    Undisputed for the purposes of this instant motion.** |
| 43.   Deputy Kunar later assisted Deputy Prince to fill out some paperwork related to Radwan's booking and/or personal property. | **43.    Undisputed for the purposes of this instant motion.** |
| 44.   A tow-truck operator arrived at the scene and began to prepare to tow Radwan's vehicle away. | **44.    Undisputed for the purposes of this instant motion.** |
| 45.   Sergeant Fouste then left the scene and did not see Radwan again that evening. | **45.**    Defendant Fouste's Patrol Video System Video recording, Separately Filed Exhibit "C", shows that plaintiff's car was towed from the scene before Fouste left the scene of the December 23, 2006 incident with plaintiff. Although Defendant Fouste testified at his deposition that he did not audio record his encounter with Mr. Radwan because his microphone was not functioning, Defendant Fouste's patrol video system tape for that date, shows that defendant Fouste turned on his microphone minutes after he left the scene of the Radwan arrest (See Exhibit |

| | |
|---|---|
| | "FF"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, 112: 1-6, see also Exhibit "C"; copy of defendant James Fouste's patrol video system tape on December 23, 2006, Windows Media Player time 02:46:57.  This shows that Defendant Fouste's microphone was working and deliberately did not record his encounter with Mr. Radwan. |
| 46.   At approximately 11:10 p.m., Deputy Kunar was dispatched to another call for service and left the scene. | 46.     **Undisputed for the purposes of this instant motion.** |
| 47.   Sergeant Fouste did not touch or strike or have any physical contact with Radwan at any time after he was initially placed in a patrol vehicle. | 47.     **Undisputed for the purposes of this instant motion.** |
| 48.   Sergeant Fouste did not witness any other deputy touch, strike, or have any physical contact with Radwan after he was initially placed in a patrol vehicle. | 48.     **Undisputed for the purposes of this instant motion.** |
| 49.   Sergeant Fouste did not witness any of the actions following Radwan's initial placement in a patrol vehicle up to and including his being Tasered at the scene, his transportation to the jail, and his treatment at the jail. | 49.     Disputed.  The Patrol Video tape of Sgt. Fouste shows that the plaintiff was ordered to get up off of the driveway and was taken to deputy Prince's patrol car at 22:44:04 hours (the time is apparently off on his video recorder), and that Fouste left the scene of the incident at 23:53:31 hours (probably 22:53:31 hours, which is still 10 minutes off), See Exhibit "C"; copy of the Patrol Video System recording of defendant OCSD Sgt. James Fouste of December 23, 2006 ("FOUSTE VIDEO") at Windows Media Player Time 02:46:57; see also The Computer Assisted Dispatch printout, Exhibit "P"; ("CAD") printout of incident of December 23, 2006, shows that Sgt. |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

21

| | |
|---|---|
| | Fouste (who is shown on the CAD printout as "4S40", was Onscene ("ONS") at the scene of the incident in Laguna Niguel with the plaintiff at 21:39:33 hours (9:39 p.m.), and left the scene of the incident ("REM") with the plaintiff at 23:03:54 hours (11:03 p.m.). Moreover, at the very end of Sgt. Fouste's tape, after the static portion following 23:53:31 hours, shows Sgt. Fouste's patrol car traveling on the roadway at 23:58:56 hours (11:58 p.m.), with his remote microphone actually on (shown by the "M" on the video display). Therefore, Sgt. Fouste was present at the scene for approximately one hour and fourteen minutes after the plaintiff was placed into defendant deputy Prince's patrol car. See Exhibit "C"; copy of the Patrol Video System recording of defendant OCSD Sgt. James Fouste of December 23, 2006, at Windows Media Player Time 02:46:57. |
| 50.   Deputy Kunar was not present when Deputy Hergesheimer arrived at the scene. | **50.   Undisputed for the purposes of this instant motion.** |
| 51.   Deputy Kunar did not search Radwan's person | **51.   Undisputed for the purposes of this instant motion.** |
| 52.   Deputy Kunar did not place Radwan in handcuffs. | **52.   Undisputed for the purposes of this instant motion.** |
| 53.   After leaving the scene, Deputy Kunar did not have any further interaction with Radwan that evening or early morning. | **53.   Undisputed for the purposes of this instant motion.** |
| 54.   On December 23, 2006, Deputy Hergesheimer was working reserve transportation detail. | **54.   Undisputed for the purposes of this instant motion.** |
| 55.   Deputy Hergesheimer arrived at the scene to transport Radwan to jail. | **55.   Undisputed for the purposes of this instant motion.** |
| 56.   Deputy Hergesheimer | **56.   Undisputed for the purposes of this** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

22

| | |
|---|---|
| approached Paseo De Colinas, near Del Cerro, where he saw several other patrol cars parked. | instant motion. |
| 57.   When Deputy Hergesheimer arrived, Radwan was in the backseat of another patrol vehicle. | 57.   **Undisputed for the purposes of this instant motion.** |
| 58.   Deputy Hergesheimer had Radwan stand near the right front fender of his patrol car. | 58.   **Undisputed for the purposes of this instant motion.** |
| 59.   Deputy Hergesheimer began to search Radwan for weapons and began to change his handcuffs. | 59.   **Partially disputed.** Deputy Hergesheimer searched Radwan and changed his handcuffs, but he also put leg irons on the plaintiff while plaintiff was at the side of his patrol car. JOSHUA DECL ¶¶ 46-47. |
| 60.   Deputy Hilliard was filling out paperwork near Deputy Prince's patrol vehicle when Deputy Hergesheimer began the process of switching Radwan's handcuffs and searching him next to Deputy Hergesheimer's patrol car. | 60.   **Disputed.** See Separately Filed Exhibit "R"; Defendant Hergersheimer's Patrol Video System Video recording of December 23, 2006 through December 24, 2006; Windows Media Player Counter Number 05:28 (video screen time 00:09:41) through Windows Media Player Counter Number 05:54 (video screen time 00:09:41), shows plaintiff being taken out of defendant Prince's Patrol Car, and shows the plaintiff being taken by defendants Hergesheimer and Hilliard taking the plaintiff over to the right front fender area of defendant Hergesheimer's patrol car. See also, JOSH DECL ¶¶ 43-46. |
| 61.   Deputy Prince was standing near Deputy Hergesheimer's patrol vehicle when Deputy Hergesheimer began the process of switching Radwan's handcuffs and searching him next to Deputy Hergesheimer's patrol car. | 61.   **Disputed.** See Separately Filed Exhibit "R"; Defendant Hergersheimer's Patrol Video System Video recording of December 23, 2006 through December 24, 2006; Windows Media Player Counter Number 05:28 (video screen time 00:09:41) through Windows Media Player Counter Number 05:54 (video screen time 00:09:41), shows plaintiff being taken out of defendant Prince's Patrol Car, and shows |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

23

| | |
|---|---|
| | the plaintiff being taken by defendants Hergesheimer and Hilliard taking the plaintiff over to the right front fender area of defendant Hergesheimer's patrol car. See also, JOSH DECL ¶¶ 43-46. |
| 62.   Deputy Hergesheimer began to bend Radwan over the hood of his patrol vehicle so he would not have to move his arms in an uncomfortable position to conduct his search and to change the handcuffs. | 62.  **Undisputed for the purpose of this instant motion.** |
| 63.   Deputy Hergesheimer lifted Radwan's arms up behind him to maintain physical control and to try and keep his upper body from straightening out. | 63.  **Disputed. Hergesheimer moved plaintiff's arms up to hurt and to provoke the plaintiff.** See Separately Filed Exhibit "R"; Defendant Hergersheimer's Patrol Video System Video recording of December 23, 2006 through December 24, 2006, at Windows Media Player format Counter Number 07:33 (video screen time 00:11:47) showing plaintiff being bent over the hood of defendant Hergersheimer's car by said defendant; Windows Media Player Counter Number 07:44 (video screen time 00:11:53) showing plaintiff's handcuffed arms being pushed (jacked-up) and held upward; Windows Media Player Counter Number 07:56 (video screen time 00:12:10) showing plaintiff then being ordered to stand up, and Windows Media Player Counter Number 07:59 (video screen time 00:12:12), and showing plaintiff being ordered to spread his feet apart. See also, JOSH DECL ¶ 50. Hergesheimer also testified in his November 17, 2009 deposition to forcing the plaintiff's body downward, even though he does not recall ever asking the plaintiff to bend over, and even though he doesn't know if he caused the plaintiff to suffer any pain, and |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

24

| | |
|---|---|
| | continued to jack plaintiff's arms up because he claims that the plaintiff resisted, squired and twisted. Hergesheimer also claimed that he wouldn't want the plaintiff's face to be on the hood of his car, and he doesn't know if plaintiff's face ever was on the hood of his car (even though his patrol video shows just that). However on p.55:12-15 of his deposition, Hergesheimer says that he did lift up the plaintiff's arms to force his face onto the hood of his patrol car. See, Separately Filed Exhibit "Y"; excerpt of pages 55:12-15 and 77:10 – 82:8 of the deposition of defendant Hergesheimer of November 17, 2009. |
| 64.   Radwan tried to twist his body, stiffened his body, and turned his head toward Deputy Hergesheimer. | 64.  Disputed.  Plaintiff didn't stiffen his body, and only turned his head to his right tell the deputies (defendant Prince to his right, in front of the patrol car, and defendants Hergesheimer and Hilliard behind him, that he **was** cooperating, but that he didn't like the brutal way that he was being treated, and verbally protested the unreasonable force being used upon him, including: 1) defendants stepping on his leg-iron chains that had been placed upon him by defendants,2)  jacking his handcuffed arms up behind him (hurting him for no apparent reason) and 3) hitting the plaintiff in his testicles (well after his belt had been taken-off by said defendants). See, JOSH DECL ¶ 53-54, 106. |
| 65.   Deputy Hergesheimer told Radwan to spread his feet apart. | 65.  **Undisputed for the purpose of this instant motion.** |
| 66.   Deputy Hergesheimer told Radwan to hold still and stop resisting. | 66.  **Disputed.** See, JOSH DECL ¶¶ 47, 52, 106. |
| 67.   Deputies Hilliard and Prince saw Radwan looking back, moving his body around, tensing up his | 67.  **Disputed.** See, JOSH DECL ¶¶ 54-56, 106. |

| | |
|---|---|
| legs, and arching his back. | |
| 68.  Deputies Hilliard and Prince were concerned that Radwan may attempt to spit on one of them as he looked back, and that he would attempt to escalate his physical resistance. | 68.  **Disputed.**  Plaintiff has not resisting. Plaintiff could not have spit on them. Plaintiff was bent over car and was not resisting; he was just talking. See, JOSH DECL ¶¶ 48-56, 106. |
| 69.  Deputy Prince and Deputy Hilliard approached to assist Deputy Hergesheimer. | 69.  **Disputed.**  Hilliard was already behind plaintiff. See, JOSH DECL ¶¶ 46-54. |
| 70.  Deputy Hilliard stood on Deputy Hergesheimer's right side and told Radwan to stop resisting. | 70.  **Disputed.**  See, JOSH DECL ¶¶ 54 – 65, 106. |
| 71.  Deputy Prince told Radwan to stop resisting and to cooperate. | 71.  **Disputed.**  See, JOSH DECL ¶¶ 58-67, 106 |
| 72.  Deputy Prince stood to Deputy Hergesheimer's left and placed his hand on Radwan's neck to prevent Radwan from arching his back again. | 72.  **Disputed.**  The tape shows that Prince put his hand on Radwan's neck because Radwan was complaining to the deputies about his treatment by them. See, JOSH DECL ¶¶ 50-56, 106. |
| 73.  Radwan continued to tense his legs, tried to arch his back, and kept trying to look back at the deputies. | 73.  **Disputed.**  Plaintiff simply turned his neck to complain to the deputies regarding his treatment. See, JOSH DECL ¶¶ 50-56, 106. |
| 74.  Radwan also tried to bring his legs together after he was told to keep them apart. | 74.  **Disputed.** See, JOSH DECL ¶¶ 50-56, 106. |
| 75.  Deputies Prince and Hilliard repeated their instruction for Radwan to keep his head down and forward. | 75.  **Disputed. Disputed.** See, JOSH DECL ¶¶ 50-56. |
| 76.  At one point, Radwan relaxed his muscles, and his head dropped to the hood once as a result of Deputy Prince's counter-pressure. | 76.  **Disputed.**  Defendant Prince slammed plaintiff's face into hood of car. See, JOSH DECL ¶ 63. |
| 77.  Radwan challenged Deputies Hilliard and Prince to kill him. | 77.  **Undisputed for the purpose of this motion.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

26

| | |
|---|---|
| 78.   Deputy Prince reiterated the command for Radwan to stop resisting and responded that "We're not going to kill you." | 78.   **Undisputed that Prince said that he was not going to kill him. However, he didn't tell plaintiff to stop resisting.** See, JOSH DECL ¶¶ 50-56. |
| 79.   Radwan again tensed his legs and attempted to arch his back. | 79.   **Disputed.** See, JOSH DECL ¶¶ 54, 106. |
| 80.   Radwan was warned that if he continued to attempt to physically resist, he would be taken to the ground. | 80.   Disputed. See, JOSH DECL ¶¶ 66, 67, 106; Defendant Prince **did not** warn the plaintiff that if continued to resist that he would be taken to the ground. See Exhibit "GGG" PRINCE DEPO II, 114:24-115:7. |
| 81.   Deputy Hergesheimer eventually gave up physical control over Radwan to the two deputies and went to the trunk of his patrol car to retrieve leg irons. | 81.   **Disputed.** Defendants had already placed the leg irons on plaintiff at the side of the car, prior to being taken down onto the ground. See, JOSH DECL ¶ 46. |
| 82.   While Deputy Hergesheimer was retrieving the leg irons, Radwan was taken to the ground on the grass portion of the sidewalk. | 82.   **Disputed.** Defendants had already placed the leg irons on plaintiff at the side of the car, prior to being taken down onto the ground. See, JOSH DECL ¶ 46. |
| 83.   Once Radwan was lying stomach-first on the ground, he began to roll back and forth and tried to lift his legs. | 83.   **Disputed.** See, JOSH DECL ¶¶ 66-68, 106. Plaintiff was thrown to the ground and was immediately tased in his back. |
| 84.   Deputy Hilliard held down his legs to prevent him from kicking. | 84.   **Disputed.** Plaintiff was thrown to the ground and was immediately tased in his back. See, JOSH DECL ¶¶ 66-68, 106. |
| 85.   Deputy Prince was concerned that Radwan was attempting to get to his knees, from which he could establish a fighting stance. | 85.   **Disputed.** This is absurd. Plaintiff was already handcuffed and on his belly, on the ground. What type of fighting stance could he have taken while he was handcuffed and leg-ironed. He couldn't have even gotten up, and he never resisted the deputies. |
| 86.   Deputy Prince and Deputy Hilliard continued to tell Radwan to stop resisting. | 86.   **Disputed.** Plaintiff was thrown to the ground and was immediately tased in his back. See, JOSH DECL ¶¶ 66-68, 106. |
| 87.   Radwan continued to | 87.   **Disputed.** Plaintiff was thrown to the |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

27

| | |
|---|---|
| physically resist, and Deputy Prince deployed the Taser against Radwan for 5 seconds in "drive stun" mode. | ground and was immediately tased in his back. See, JOSH DECL ¶¶ 66-68, 106 |
| 88.   Immediately after the application of the Taser, Radwan stopped physically resisting. | 88.  **Disputed.**  Plaintiff was thrown to the ground and was immediately tased in his back. He didn't resist the deputies, nor did he even have any time to do so Plaintiff was thrown to the ground and was immediately tased in his back. See, JOSH DECL ¶¶ 66-68. |
| 89.   Deputy Hilliard told Radwan that he needed to stand up and that the deputies would place him in the patrol car; Deputy Hilliard warned him that if he resumed physically resisting, he would be Tased again. | 89.  Disputed.  Hilliard stated: *"OK. HEY, HEY. WE ARE GOING TO MAKE THIS REAL EASY. OK. YOU'RE GOING TO GET UP, GET INTO THIS OFFICER'S CAR. IF YOU'RE NOT, YOURE GOING TO GET TASED AGAIN. OKAY?"* Exhibit "R"; Defendant Hergersheimer's Patrol Video System Video recording of December 23, 2006 through December 24, 2006, Windows Media Player Counter 11:56. |
| 90.   Then, Deputy Hergesheimer's ankle cuffs were applied to Radwan. | 90.  **Disputed.** The ankle cuffs were already put on Josh. JOSHUA DECL ¶¶ 46-47. |
| 91.   Radwan complied and he was placed in the back seat of Deputy Hergesheimer's patrol vehicle. | 91.  **Undisputed for the purposes of this instant motion.** |
| 92.   Neither Deputy Hilliard nor Deputy Hergesheimer used a Taser on Radwan. | 92.  Disputed. Hilliard at least assisted Prince in applying the taser to plaintiff, and Hergeshiemer may have also assisted. JOSHUA DECL ¶ 67. |
| 93.   Apart from the single 5 second "drive stun" application of the Taser by Deputy Prince, deputies did not see any other use of a Taser on Radwan. | 93.  Disputed. Hilliard at least assisted Prince in applying the taser to plaintiff, and Hergeshiemer may have also assisted. JOSHUA DECL ¶ 67. |
| 94.   Hergesheimer then transported Radwan to the jail. | 94.  **Undisputed for the purposes of this instant motion.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

28

| | |
|---|---|
| 95.   Deputies Hilliard and Prince, did not have any further interaction with Radwan that evening or early morning. | 95.  **Undisputed for the purposes of this instant motion.** |
| 96.   Radwan tried to engage Deputy Hergesheimer in conversation about his arrest, but the deputy declined to respond. | 96.  **Undisputed for the purposes of this instant motion.** |
| 97.   Radwan shifted his position in the backseat several times on the way to the jail. | 97.  **Undisputed for the purposes of this instant motion.** |
| 98.   At one point, Deputy Hergesheimer asked what Radwan was doing, and he said he was trying to pull his jacket on. | 98.  **Undisputed for the purposes of this instant motion.** |
| 99.   Radwan did not complain of any pain while he was in the back seat on the way to the jail. | 99.  **Disputed.** Plaintiff complained that the leg irons were way too tight almost immediately after being put into Hergesheimer's patrol car.  Exhibit "R"; Defendant Hergesheimer's Patrol Video System Video recording of December 23, 2006 through December 24, 2006 at Windows Media Player Counter 12:42. |
| 100. At the jail's entry gate, Deputy Hergesheimer informed jail personnel that he had one male uncooperative arrestee. | 100.  **Undisputed.** |
| 101. On December 24, 2006, at approximately 12:10 a.m., Deputies Padilla, Garcia, Foster and Hernandez were informed that a transporting deputy was bringing in an uncooperative male, and needed assistance. | 101.  **Undisputed.** |
| 102. Several jail deputies came out of the entryway to assist. | 102.  **Undisputed.** |
| 103. Deputy Hergesheimer informed Deputy Padilla that a small amount of marijuana, as well | 103.   **Undisputed.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

29

| | |
|---|---|
| as a number of weapons, had been found in Radwan's possession. | |
| 104. Deputy Hergesheimer also informed Deputy Padilla that Radwan had physically struggled with the deputies at the scene and that he had to be Tased. | 104.   **Undisputed.** |
| 105. Deputy Padilla opened the rear passenger side door of the patrol vehicle and explained the booking process to Radwan and the need for his cooperation. | 105.  **Undisputed.** |
| 106. Radwan twice interrupted Deputy Padilla as he was explaining what would happen and the need for his cooperation. | 106.  **Disputed.**  The handheld tape shows plaintiff talking, but not interrupting. Exhibit "R"; at Windows Media Player Counter 46:46 / screen time 00:51:00 and at Windows Media Player Counter 46:55 / screen time 00:51:15. |
| 107. Deputy Padilla told Radwan to exit the patrol car, but he said he could not because his legs were chained together. | 107. **Undisputed.** |
| 108. Radwan's upper body was near the right side of the patrol car, so Deputy Padilla moved over to the left side and told Radwan to exit feet-first. | 108. **Undisputed.** |
| 109. Deputy Foster was on the left driver side of the back seat with Deputy Padilla when Radwan was ordered to exit the patrol car feet first. | 109.  **Undisputed.** |
| 110. Radwan began to slide across the back seat, but then said he needed help. | 110.  **Undisputed.** |
| 111. After coming to the left side of the back seat, Radwan asked deputies to pull his legs to get him out of the patrol car. | 111. **Undisputed.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

30

| | |
|---|---|
| 112. Two of the jail deputies pulled Radwan out of the back seat of Deputy Hergesheimer's patrol vehicle, feet first. | 112. **Undisputed.** |
| 113. Deputy Hergesheimer, was on the other side of the open door, so Deputy Foster walked away to let him pass. | 113. **Undisputed.** |
| 114. Radwan then asked for assistance in getting up. | 114. **Undisputed.** |
| 115. Deputy Hergesheimer helped Radwan to his feet by grabbing his left arm; Deputy Padilla took Radwan's right arm. | 115. **Undisputed.** |
| 116. Radwan refused to walk and said that his ankle was too tight. | 116. **Disputed.** Plaintiff didn't refuse to walk. He couldn't walk. JOSHUA DECL ¶¶ 84-88. |
| 117. Deputy Padilla informed Radwan that they would be removed shortly. | 117. **Undisputed.** Padilla said the faster plaintiff got inside the jail the faster the leg-irons would be removed. |
| 118. Radwan began to scream, to slump toward the ground, and requested that he be carried. | 118. **Undisputed.** |
| 119. Deputy Padilla did not loosen the leg chains while still in the parking area because Radwan had not been properly searched by jail personnel, and they were still in a relatively unsecured area. | 119. **Disputed.** Padilla just wanted to hurt plaintiff . . . plus Padilla didn't take the leg-iron's off after plaintiff was inside of the jail plus, after plaintiff was medically cleared for booking. JOSHUA DECL ¶ 91. |
| 120. Deputy Garcia lifted Radwan by the legs or the leg-iron chain, after which Radwan stopped screaming. | 120. **Disputed.** Plaintiff wasn't screaming; he was crying out in pain. |
| 121. Radwan was placed standing at the triage counter to answer questions from the triage nurse. | 121. **Undisputed.** |
| 122. Deputy Hergesheimer stood to Radwan's left. | 122. **Undisputed.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

31

| | |
|---|---|
| 123. Deputy Padilla stood to Radwan's right and one or more other jail deputies were in the vicinity observing. | 123. **Undisputed.** |
| 124. Deputy Padilla did not step on Radwan's ankles or deliberately stand on the chain between his ankle cuffs. | 124. **Disputed.** During plaintiff's medical interview at the Jail Triage Counter, defendant Padilla was standing and stepping on plaintiff's leg irons chain; causing plaintiff to suffer great pain, for no legitimate reason. Plaintiff complained to deputy Padilla about his breaking his ankle and stepping on his leg iron chain, but for whatever reason, he continued to torture plaintiff by stepping on his leg iron chains for approximately three minutes. See, Exhibit "G"; Windows Media Player Counter 08:13 – 11:15; See also, JOSHUA DECL ¶ 89. |
| 125. As Radwan was answering the triage nurse's questions, he became loud and excited, and alternated to being quiet. | 125. **Disputed.** See, Exhibit "G"; Windows Media Player Counter 08:13 – 11:15; See also, JOSHUA DECL ¶ 89. |
| 126. While he was answering triage questions, Radwan gave non-responsive answers and made argumentative statements regarding what had happened during his arrest and his entry into the IRC. | 126. **Disputed.** See, Exhibit "G"; Windows Media Player Counter 08:13 – 11:15; See also, JOSHUA DECL ¶ 89. |
| 127. Radwan also said that he wanted to kill himself. | 127. **Undisputed.** |
| 128. The triage nurse eventually was able to finish the screening. | 128. **Undisputed.** |
| 129. Deputy Hergesheimer, who had been standing to Radwan's left, stepped away and Deputy Foster stepped to Radwan's left and took Radwan's left arm. | 129. **Undisputed.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

| | |
|---|---|
| 130. After triage, the jail deputies led Radwan toward an uncuff area to be searched and uncuffed. | 130. **Undisputed.** |
| 131. Deputy Hergesheimer did not see any deputy place Radwan in a medical observation cell. | 131. **Undisputed.** |
| 132. Radwan took several steps, and then dropped to the floor and said that he could not walk. | 132. **Undisputed.** |
| 133. Up to this point, Radwan had repeatedly been uncooperative and his odd behavior indicated he might have been under the influence of drugs. | 133. **Disputed.** Plaintiff was cooperative throughout the entirety of the December 23-24, 2006 incidents complained of. JOSHUA DECL ¶ 106. He was simply being physically abused and literally tortured. He couldn't walk because his leg irons hurt him so badly. See, Exhibit "G"; Mixed fixed video monitoring and hand held video of December 24, 2006 of plaintiff at the Orange County Jail, Intake Release Facility; Windows Media Player Counter 05:39 – 11:25. |
| 134. As a result, Deputy Padilla decided to institute a booking process delay and place Radwan in a medical observation cell so that he could be observed until he was able to finish the booking process. | 134. **Disputed.** Plaintiff was cooperative throughout the entirety of the December 23-24, 2006 incidents complained of. JOSHUA DECL ¶ 106. He was simply being physically abused and literally tortured. He couldn't walk because his leg irons hurt him so badly. See, Exhibit "G"; Mixed fixed video monitoring and hand held video of December 24, 2006 of plaintiff at the Orange County Jail, Intake Release Facility; Windows Media Player Counter 05:39 – 11:25. |
| 135. Deputy Garcia approached and lifted Radwan's legs by grabbing the ankle cuff chain. | 135. **Undisputed.** |
| 136. Deputies began to carry Radwan down a hallway toward the medical observation cells. | 136. **Undisputed.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

33

| | |
|---|---|
| 137. Along the way, Deputy Streeter grabbed Radwan's right foot. | 137. **Undisputed.** |
| 138. Sergeant Essoe was informed that a transporting deputy had brought in an uncooperative male, and Deputy Padilla had decided to institute a booking process delay. | 138. **Undisputed.** |
| 139. Sergeant Essoe responded to the medical observation cells to observe Radwan's placement in a medical observation cell. | 139. **Undisputed.** |
| 140. Deputy Hernandez entered the cell first. | 140. **Undisputed.** |
| 141. Deputy Hernandez was followed by Deputy Foster and Deputy Padilla, as they each held one of Radwan's arms. | 141. **Undisputed.** |
| 142. Then, Deputy Garcia entered with Deputy Streeter, as they both had control of Radwan's legs. | 142. **Undisputed.** |
| 143. Deputy Streeter and Deputy Garcia began to remove Radwan's boots and socks while the ankle cuffs remained on Radwan's ankles. | 143. **Undisputed.** |
| 144. The ankle cuffs had been secured over Radwan's ankles and socks, but deputies were able to remove his socks without loosening the ankle cuffs. | 144. **Undisputed.** |
| 145. Once Deputies Streeter and Garcia had removed his boots and socks, Deputy Garcia then unlocked the ankle cuffs and momentarily exited the cell. | 145. **Undisputed.** |
| 146. Deputy Garcia handed the ankle cuffs off to another deputy who had been standing outside the | 146. **Undisputed.** |

cell.

| | |
|---|---|
| 147. At this point, Deputy Hernandez took control of Radwan's left leg, Deputy Streeter took control of Radwan's right leg, Deputy Foster maintained control of Radwan's left arm, and Deputy Padilla maintained control over Radwan's right arm. | 147. **Undisputed.** |
| 148. Deputy Garcia returned to the cell, got a Taser, and held it in his right hand, pointing at the ground. | 148. **Undisputed.** |
| 149. Deputies Streeter, Garcia, and Hernandez then removed Radwan's pants. | 149. **Undisputed.** |
| 150. Deputy Streeter and Deputy Hernandez crossed Radwan's feet behind his legs and pushed them down to keep Radwan from being able to kick his feet. | 150. **Undisputed.** |
| 151. Deputy Garcia aimed his Taser at Radwan as Deputy Padilla informed Radwan that he would remove the handcuffs, and warned that if he attempted to resist when he did so, Radwan would be Tased. | 151. **Undisputed.** |
| 152. Deputy Padilla and Deputy Foster removed Radwan's handcuffs and removed his jacket and shirt. | 152. **Undisputed.** |
| 153. Deputy Padilla maintained a control hold on Radwan's right arm. | 153. **Disputed.** It was not a control hold. It was a shoulder dislocation maneuver, involving forcing the plaintiff's right arm to come out of its socket. Defendants Foster and Padilla kept on twisting plaintiff's arms, causing him to suffer great pain; especially to his shoulders. Exhibit "G"; Windows Media Player Counter 14:33. This caused plaintiff to suffer incredible pain. |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

35

| | |
|---|---|
| | JOSHUA DECL ¶ 101. |
| 154. Deputy Foster maintained a control hold on Radwan's left arm. | 154. **Disputed.** Once plaintiff was in the Medical Observation Cell, he was smothered by the body weight of deputies, and tortured by their wrist locks and literal twisting of his arms. Plaintiff begged for mercy, for the deputies to stop torturing him. Exhibit "G"; Windows Media Player Counter 13:05. JOSHUA DECL ¶ 95. |
| 155. Deputy Garcia threw Radwan's jacket out of the cell. | 155. **Undisputed.** |
| 156. Deputy Hernandez took Radwan's shirt and stepped out of the cell, leaving Deputy Streeter in control of both Radwan's legs. | 156. **Undisputed.** |
| 157. Deputy Foster then ordered Radwan to place his left hand under his belly button and to leave it there. | 157. **Undisputed.** |
| 158. Deputy Foster then helped Radwan place his left hand under his stomach. | 158. **Undisputed.** |
| 159. At this point, Deputy Garcia stepped back [into the cell] and aimed his Taser at the ground. | 159. **Undisputed.** |
| 160. Deputy Padilla then ordered Radwan to place his right hand under his stomach and to leave it there. | 160. **Undisputed.** |
| 161. Deputy Padilla then helped Radwan to place his right hand underneath his stomach and ordered him to grab his left hand. | 161. **Undisputed.** |
| 162. Deputy Padilla then ordered Radwan to remain in that position until all the deputies exited the cell; he warned Radwan that if he attempted to get up before all the | 162. **Undisputed.** |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

| | |
|---|---|
| deputies had exited, a Taser would be used against him. | |
| 163. At this point, Deputy Garcia aimed the Taser at Radwan's back in case he attempted to get up or fight before all of the deputies had exited the cell. | 163. **Disputed.** Plaintiff was threatened with being tased if he didn't follow directions, or if he moved from his position on the cell floor until all of the deputies were out of the cell. Exhibit "G"; Windows Media Player Counter 14:38-16:57. |
| 164. Deputy Foster then exited the cell. | 164. **Undisputed.** |
| 165. Then, Deputy Padilla exited the cell. | 165 **Undisputed.** |
| 166. Then, Deputy Streeter exited the cell, followed immediately by Deputy Garcia. | 166. **Undisputed.** |
| 167. Once there were no deputies remaining in the cell and the door was closed, Radwan was ordered to get up. | 167. **Undisputed.** |
| 168. Radwan rolled onto his right side and refused to get up. | 168. **Disputed.** Plaintiff didn't refuse to get up. Plaintiff had been tortured so bad that he could not do so. JOSHUA DECL ¶ 105; Exhibit "G"; Windows Media Player Counter 11:15-18:31. |
| 169. Radwan's clothing was removed at the behest of the jail's mental health staff, who were concerned regarding his threats to kill himself, which he made during triage. | 169. **Undisputed.** |
| 170. At 2:02 a.m., Radwan was able to stand and talk during a check of his medical observation cell. | 170. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

37

| | |
|---|---|
| | sleeping. |
| 171. At 2:14 a.m., Radwan was standing in his medical observation cell. | 171. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 172. At 3:14 a.m., Radwan was standing in his medical observation cell. | 172. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 173. At 3:45 a.m., Radwan was standing in his medical observation cell. | 173. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 174. At 5:45 a.m., Radwan was standing in his medical observation cell, and kicked the door during a check of his cell. | 174. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 175. At 7:45 a.m., Radwan was standing in his medical observation cell. | 175. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two |

| | |
|---|---|
| | hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 176. At 7:57 a.m., Radwan was standing in his medical observation cell. | 176. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 177. At 8:15 a.m., Radwan was standing in his medical observation cell. | 177. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 178. At 8:20 a.m., Radwan was standing in his medical observation cell. | 178. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 179. At approximately 2:30 a.m., Deputy Padilla checked on Radwan and he was standing at the window of the cell. | 179. **Undisputed.** However, the Sobering Cell Activity Log, Separately filed Exhibit "AA", shows that for about the first two hours after the plaintiff had been placed in his cell, he was lying on the cement floor. This undisputed claimed fact also fails to mention all of the checks on plaintiff |

| | |
|---|---|
| | wherein he was lying on the floor and/or sleeping, which were shown in the Log. |
| 180. Sergeant Essoe was present to observe the placement of Radwan in the cell, but did not have any verbal or physical interaction with Radwan. | 180. **Undisputed.** |
| 181. Deputy Jarrett Kurimay was not present at the IRC during the incident. | 181. **Undisputed.** |
| 182. Sergeants Fouste and Essoe, and Deputies Hilliard, Prince, Kunar, Hergesheimer, Padilla, Garcia Foster and Hernandez did not observe any actions by any other deputy or employee of the Orange County Sheriff's Department to suggest any violation of Radwan's constitutional rights. | 182. **Disputed.** Plaintiff was unlawfully seized, was subjected to unreasonable force, was unlawfully arrested, in violation of his rights under the 4th and 14th amendment to the United States Constitution, and under analogous provisions of the California Constitution, and was retaliated against for his exercise of his first amendment free speech / right to petition rights under the United States Constitution, and under analogous provisions of the California Constitution. See JOSHUA DECL ¶¶ 23-108; See, Exhibit "G"; Mixed fixed video monitoring and hand held video of December 24, 2006 of plaintiff at the Orange County Jail, Intake Release Facility; See, Exhibit "C"; copy of the Patrol Video System recording of defendant OCSD Sgt. James Fouste of December 23, 2006 ("FOUSTE VIDEO"); See, Exhibit "A"; copy of the Patrol Video System recording of defendant OCSD Deputy Sheriff Matthew Prince of December 23, 2006 ("PRINCE VIDEO"), and Exhibit "B"; copy of the Patrol Video System recording of defendant OCSD Deputy Sheriff Sean Hilliard of December 23, 2006 ("HILLIARD VIDEO"); See, Exhibit "M"; copy of a transcript of the Orange County Sheriff's Department 911 telephone and |

AMENEDED STATEMENT OF MATERIAL FACTS IN DISPUTE

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

radio communications; See, Exhibit "R"; Defendant Hergersheimer's Patrol Video System Video recording of December 23, 2006 through December 24, 2006; See, Exhibit "S"; Excerpt of Declaration of Deposition of defendant James Fouste of December 31, 2009; pp. 59:6-62:10; See, Exhibit "U"; CD of 911 and Orange County Sheriff's Department Radio Transmissions of December 23, 2006 regarding the incident complained of in this action.

Defendant Sergeant Fouste was a defendant in a case in 2001 involving then plaintiff, Cory Baima (*Cory Baima v. County of Orange, George Kluchonic, James Fouste, Monte Huotari, David Cappel, and Does 1 through 10, inclusive*; SACV-01-710 DOC (ANx)). That case involved Sergeant Fouste, then Deputy Fouste, falsely arresting and using unreasonable force on plaintiff Cory Baima. Defendant Fouste had his microphone on during most of his encounter with Mr. Baima. However, after torturing Mr. Baima, Defendant Fouste realized that he forgot to turn his microphone off during the torturing of Mr. Baima and quickly turned his microphone off (See Exhibit "D"; copy of defendant James Fouste's patrol video system tape on February 13, 2001, Windows Media Player time 05:04). Defendant Fouste identified himself in the video during his deposition for this litigation (See Exhibit "RR"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, 117: 16-25, 118: 1-11). Realizing that he had just audio recorded himself torturing Mr. Baima, Defendant Sergeant Fouste stated, "I think my mic's

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

41

on" and quickly turns off his microphone (See Exhibit "D"; copy of defendant James Fouste's patrol video system tape on February 13, 2001, Windows Media Player time 05:05. See also Exhibit "SS"; Transcript of a Conversation between Defendant Deputy Fouste and Baima, February 13, 2001, pg.5).

Defendant Fouste's pattern of dishonesty was further shown when he authored a report for the incident involving Mr. Baima. Defendant Fouste stated in his report that, "Baima attempted to pull away from Kluchonic and resisted his efforts to handcuff him . . . . Even though Baima was handcuffed, we were unable to safely search him because he was still being uncooperative." Defendant Fouste also states in his report that Mr. Baima was refusing to put his hands up when instructed to do so (See Exhibit "TT"; copy of Orange County Sheriff's Department Deputy Fouste's Initial Crime Report, Case No. 01-0031144).

Defendant Fouste's patrol video system tape clearly shows that none of the statements in Defendant Fouste's report were true. Mr. Baima put his hands up immediately after Defendant Fouste instructed him to do so. Mr. Baima can be seen on the video complying with every command that Defendant Fouste gave (See Exhibit "D"; copy of defendant James Fouste's patrol video system tape on February 13, 2001).

| | |
|---|---|
| 183. During employment with the Orange County Sheriff's Department, Sergeant Fouste, and Deputies Hilliard, Prince, Kunar and Hergesheimer have received | 183. **Disputed in part.** The Orange County Sheriff's Department does not have standards for the proper and reasonable use of force, and effectuating lawful detentions, seizures, searches and arrests. At his |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

42

extensive training from the Orange County Sheriff's Department specific to their assignments and regarding the applicable standards for the proper and reasonable use of force, and effectuating lawful detentions, seizures, searches and arrests.

deposition in a previous case, Orange County Sheriff's Department Deputy Luke Krueger, an arrest and control techniques instructor and training officer at the Orange County Sheriff's Department Academy stated that the only use of force policy at the Orange County Sheriff's Department is the "objectively reasonable" standard set forth in *Graham v. Conner*, 490 U.S. 386 (1989) (See Exhibit "Q"; excerpt from the deposition of Luke Krueger of November 3, 2009, 75: 18-25 - 78: 1-9). The objectively "reasonable standard" is not a reasonable standard to use to train deputies. The standard is too vague and broad, leaving deputies with no guidance.

For example, the person designated at the person most knowledgeable by defendant County of Orange in this action on the issue of taser use by Orange County Sheriff's Department Deputies, Orange County Sheriff's Department Deputy Sheriff Theodore Wilder, testified in his March 16, 2010 deposition in this case that he is a Master Instructor with the Orange County Sheriff's Department in the use of tasers. Deputy Wilder trains Orange County Sheriff's Department deputy sheriffs on the use of the taser device at the Theo Lacy Facility (Exhibit "CCCCC"; excerpt of the deposition of defendant Theodore Lavert Wilder of March 16, 2010; pp. 8:11-9:21; also see Separately Filed Exhibit ""HHH"; excerpt of Deposition of Theodore Lavert Wilder of March 16, 2010 ("WILDER DEPO") 6:01-9:11). Deputy Wilder testified that whenever the use of a taser is objectively reasonable, it's within the Orange County Sheriff's Department policy guidelines (WILDER DEPO 12:07-08).

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

However, Deputy Wilder was unable to articulate any refinement, or more specific details about what "objectively reasonable" meant in the arena of taser use, and whether the Sheriff's Department had any actual standards by which a Deputy Sheriff could look to for guidance in taser usage (WILDER DEPO 11:9-12:22; 43:24-52:18) (Separately Filed Exhibit ). He identified various Orange County Sheriff's Department taser policy documents, including 1) Orange County Sheriff's Department Operations and Procedures Manual "Section 77; Electronic Control Weapon" (revised on July 20, 2006) (Exhibit "JJJ") (WILDER DEPO 17:07-18:090), 2) Orange County Sheriff's Department Revised Taser Policy – of December 31, 2009 (Separately filed Exhibit "KKK"), 3) Orange County Sheriff's Department Policy Manual Section 309 (Separately Filed Exhibit "RRRR"), 4) Orange County Sheriff's Department Rules Of Conduct 32.00.0 (2) "OCSD Electronic Control Weapon (Taser) (Separately Filed Exhibit "SSSS"); and 5) Orange County Sheriff's Department IRC Policy Manual Section 9-11 (Separately Filed Exhibit "TTTT").

Section 77: Electronic Control Weapon (Exhibit "JJJ"), provides that deputies may use the taser device in drive-stun mode (pressing the electronic contact prongs against a person) for the purpose of "pain compliance" (Exhibit "JJJ", p.1, I(A)(1)(f)). Section 77 also provides that a taser may be used to control or subdue violent or potentially violent subjects when

it is "objectively reasonable" (Exhibit "JJJ", p.1, I(A))[2]. Deputy Wilder explained that the term "potentially violent subjects" (as used Section 77) means "someone who stands the risk of exhibiting force or violence" (WILDER DEPO 39:15-43:20) (Separately filed Exhibit "UUUU"). Accordingly, Section 77, read in light of Deputy Wilder's testimony, allows a deputy to use a taser for the purposes of pain compliance (getting a person to comply with a deputy's direction to him), allows a deputy to tase someone who is potentially violent (i.e. just about anyone), and provides a guiding light standard that is too vague and broad; leaving deputies with no guidance. It articulates no standard for use of a taser, beyond that which is "objectively reasonable", essentially leaving the decision to tase civilians to the unbridled discretion of the deputy; other than requiring that a warning be given to the civilian prior to the deployment of the taser, if practical (Exhibit "JJJ", p.1, I(A)(1)(g)).

Orange County Sheriff's Department Policy Manual Section 309, allows for the tasing a person who is "potentially violent" (309.4(B)(2)).

Following the Ninth Circuit's decision in *Bryan v. McPherson*, No. 08-55622 on December 28, 2009, the Orange County Sheriff's Department has since revised their taser policy to comply with the standards set forth therein (at least on

---

[2] Section 77 also provides that the deputy must be able to articulate, in writing, why the use of the taser was "objectively reasonable" (Exhibit "JJJ", p.2, I(A)(1)(f)).

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

paper). That standard set forth in *Bryan,* and the standard used in the Orange County Sheriff's Department "Revised Taser Policy" of December 31, 2009, provide that the deputy must determine: 1) the severity of the crime, 2) whether the suspect poses a threat to the safety of the officers or others, and 3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; the most important of which is whether the suspect poses a threat to the safety of the officers or others. Exhibit "KKK, ¶¶ 3-5. Although *Bryan* is inconsistent with pre-*Bryan* Orange County Sheriff's Department taser policy, the police officer defendants in that case were nonetheless denied qualified immunity by the Ninth Circuit, as their actions were sufficiently outrageous that a reasonably well trained officer could not have reasonably believed that such actions would have been lawful.

Orange County Sheriff's Department Jail personnel have also not been adequately trained on the permissible use of a taser. When Mr. Radwan was in the cell with the deputies, he was told, "You have a taser in your back. You felt that earlier. If you don't follow my directions, you're gonna get tased again." (See Separately

---

[3] *Nancy Turner and Gabriel Celli v. County Of Orange, et al,* United States District Court, Central District of California Case Number SACV 06-492-JVS (RNBx).

[4] Mr. Celli, like Mr. Radwan, is seen screaming out in pain and agony from the deputies' outrageous treatment of an innocent and fully cooperative man. It is not coincidental that two of the defendants in this case, deputies Michael Padilla and David Hernandez, were also involved in the Celli incident.

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

46

filed Exhibit "G"; Mixed fixed video monitoring and hand held video of December 24, 2006 of plaintiff at the Orange County Jail, Intake Release Facility; Windows Media Player Counter 14:43-14:51). Mr. Radwan was then told, "You're gonna stay in this position 'til all the deputies exit the cell. If you get up, you're gonna get shot. Do you understand me?" (Exhibit "G"; Windows Media Player Counter 16:32-16:38). That was a threat to tase the plaintiff if he moved at all; notwithstanding his having been searched, stripped down to his underwear, badly brutalized (including dislocating his shoulder), and laying face down in a jail cell with his hands clenched together underneath him. This is not acceptable behavior for a peace officer.

In a previous case involving similar treatment at the Orange County Jail[3], arrestee Gabriel Celli was told, "Do not move before that door closes. If you move you're gonna get shot with a taser gun. Do you understand that?" (See Separately filed Exhibit "LLL"; hand held video of Gabriel Celli at the Orange County Jail on January 1, 2006; Windows Media Player Counter 1:59-2:17). In that case, the County of Orange's person designated as the person most knowledgeable regarding the use of force, Deputy Sheriff Luke Kruger, testified in his deposition in the Turner / Celli case that the deputies' conduct toward Mr. Celli was textbook, and that the he had never seen deputies "de-escalate" a situation better than what the deputies did with Mr. Celli (See Separately filed Exhibit "CCCC"; excerpt from the deposition of Luke Krueger of November 3, 2009, 105:

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

47

14-25, 106: 1-18).[4]

In another case of similar taser mistreatment on September 3, 2004, *Liza Danielle Munoz v. County Of Orange, et al.*, United States District Court, Central District of California CV 04-09589 AHM (VBKx), Liza Munoz, a small woman, had been removed from a medical observation cell at the Orange County Jail, and was being held down by four deputies, when their supervisor, Orange County Sheriff's Department Sergeant Raymond Ulmer, tased her in the back, while she was motionless and begging for mercy. Ms. Munoz was then further brutalized while crying and continuing to beg for mercy. See Separately filed Exhibit "MMM"; hand held video of Liza Munoz at the Orange County Jail on September 3, 2004; Windows Media Player Counter 09:47-17:15)).

In another incident, an arrestee who was brought into the Orange County Jail was repeatedly tased while he was handcuffed and was beaten-up at the Orange County Jail on March 18, 2006, as shown in Exhibit "KKKKK", attached to the declaration of attorney Brian Carlin filed by plaintiff in opposition to defendants' motions for summary judgment / summary adjudication.

Moreover, the similarities between the actions of the deputies' treatment of Mr. Celli and of the plaintiff in this case are startlingly similar.

184. The Orange County Sheriff's Department provided substantial training to its jail staff. The Orange County Sheriff's Department has an entire Training Bureau which has responsibilities include training staff

184. **Undisputed.**

| | |
|---|---|
| assigned to the jails. | |
| 185. During tenure with the Orange County Sheriff's Department, Sergeant Essoe, and Deputies Padilla, Garcia, Foster and Hernandez have received extensive training from the Orange County Sheriff's Department specific to their assignments in the custody environment regarding inmate care and management, including, without limitation, training regarding the proper use of force. | **185. Disputed in part.** The Orange County Sheriff's Department does not have proper standards for the reasonable use of force, and effectuating lawful detentions, seizures, searches and arrests.  At his deposition in a previous case, Orange County Sheriff's Department Deputy Luke Krueger, an arrest and control techniques instructor and training officer at the Orange County Sheriff's Department Academy stated that the only use of force policy at the Orange County Sheriff's Department is the "objectively reasonable" standard set forth in *Graham v. Conner*,  490 U.S. 386 (1989) (See Exhibit "NNN"; excerpt from the deposition of Luke Krueger of November 3, 2009, 75: 18-25 - 78: 1-9). The objectively "reasonable standard" is not a reasonable standard to use to train deputies.  The standard is too vague and broad, leaving deputies with no guidance, and leaving their decisions regarding the use of force to their arbitrary and unbridled discretion.<br><br>    Moreover, the four main deputies in this case involved in the literal torturing of the plaintiff at the Orange County Jail, Deputies Michael Padilla, Cyril Foster, David Hernandez and Manuel Garcia, all have reviewed the hand held video recording of the plaintiff of December 24, 2006, both inside of and outside of the Orange County Jail (Exhibit "G"; Mixed fixed video monitoring and hand held video of December 24, 2006 of plaintiff at the Orange County Jail, Intake Release Facility), and have testified in their depositions in this action that they have been involved in the intake, processing |

searching and uncuffing of thousands of arrestees at the Orange County Jail, and that they did not see anything outside of the policies, customs and practices at the Orange County Jail, for the intake and uncuffing of arrestees there; and, in fact, what is shown on the hand held video recording of the plaintiff at the Orange County Jail is the way that arrestees are treated there. See, Separately Filed Exhibit "WWWW"; excerpt of the deposition of defendant Cyril Foster of November 18, 2009, pp. 60:15-63:25 and 73:12-77:9. (Foster guesses that he has uncuffed thousands of inmates [60:15-18], and that for persons deemed to be a booking process delays (such as the plaintiff), they are typically subjected to having their legs crossed and pinned down upon their buttocks to control them, and that this was commonly done in 2006 and 2007, and that this was within the policies of the Orange County Sheriff's Department [62:20-63:13; 73:12-77:13]. Foster also testified that everything shown on the hand held video of plaintiff [Separately Filed Exhibit "G"] was within the policies of the Orange County Sheriff's Department. [77:4-9][5].

Defendant Padilla testified that the control holds, such as wrist locks that were

---

[5] Foster was shown the hand held video of the plaintiff, starting at 05:04 of Exhibit "G", during his deposition. It did not contain the fixed video monitoring that Exhibit "G" has (a combined video made by plaintiff's counsel), and that in the first twelve minutes of the hand held video, the entire episode, beginning with the plaintiff being taken out of Hergesheimer's car in the jail parking lot, to the part of the video where plaintiff was left alone in the cell in his underwear (17:04 of Exhibit "G"), he did not see anything that was out of the policies and practices at the Orange County Jail.

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

used on the plaintiff were used as a "pain compliance" techniques, to encourage persons to comply with directives, and that such techniques are painful (See Separately Filed Exhibit "XXXX"; excerpt of the deposition of Michael Padilla of November 19, 2009; (pp. 72:24-74:3; 79:23-82:15; 98:20-99:4; 101:4-15) [72:24-74:3]. Padilla also testified that the technique described above by Foster of the deputies crossing the arrestee's legs over his buttocks and using their body weight to pin them down onto the arrestee is known as the "figure four" technique, that is used to make sure that the arrestee doesn't kick the deputies or otherwise use them, and that it isn't used as a response to the arrestee's conduct in the jail, but as a matter of regular uncuffing of any booking process delay arrestees [79:23-82:15]. Padilla also testified that he has worked at the Orange County Jail since 1999, and that he has seen many arrestees go through the booking process [98:20-99:4]. He also testified that he has reviewed the hand held video of the plaintiff at the Orange County Jail, Exhibit "G", and that he didn't see anything in said video that was outside of the policies and customs of the Orange County Jail as they existed in 2006 and 2007 [101:4-15].

In the November 24, 2009 deposition of defendant deputy sheriff David Hernandez, he testified that if leg irons are not double locked that they can tighten-up and be painful. See Separately Filed Exhibit "YYYY", pp. 47:24-48:2; 56:24-57:16; 63:20-67:19 [47:24-48:2]. He also testified that the leg crossing and pinning procedure that was identified by Padilla as the "figure four", was what he called the "proned

position", that is used to put the arrestee in a position of disadvantage, so that he can't kick or stand-up. [56:24-57:16]. Hernandez also testified that from his experience with dealing with thousands of booking process delays (one of which was the plaintiff in this action), that after viewing the hand held video of the December 24, 2006 incident involving the plaintiff (Exhibit "G"), that everything that he saw on the video (the entirety of the plaintiff on Exhibit "G) was within the practices and policies of the Orange County Jail during the years 2006 and 2007 [63:20-67:19].

In another incident, an arrestee who was brought into the Orange County Jail was repeatedly tased while he was handcuffed and was beaten-up at the Orange County Jail on March 18, 2006, as shown in Exhibit "KKKKK", attached to the declaration of attorney Brian Carlin filed by plaintiff in opposition to defendants' motions for summary judgment / summary adjudication.

Moreover, in the deposition of defendant Deputy Sheriff Manuel Garcia November 18, 2009, Separately Filed Exhibit "ZZZZ", pp. 103:9-104:2, that everything that's shown in the hand held video of the plaintiff was normal for the Orange County Jail, other than the plaintiff's "refusal" to walk.

| | |
|---|---|
| 186. The Orange County Sheriff's Department does not have, and did not have on December 23-24, 2006, a policy, custom or practice of using excessive or unreasonable force on anyone during the course of a detention or arrest, or otherwise in the custody of the | 186. **Disputed.** The Orange County Sheriff's Department has a custom or practice of using excessive and unreasonable force on inmates at the Orange County Jail. When plaintiff Joshua Radwan arrived at the Orange County Jail he arrived in Orange County Sheriff's Deputy Hergesheimer's patrol vehicle (See |

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

52

1  Orange County Sheriff's
2  Department. To the contrary, it
   was and still is the policy of the
3  Orange County Sheriff's
4  Department and the County of
   Orange to use only necessary and
5  reasonable force, either during the
6  effectuation of an arrest or in the
7  custodial setting.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit "OOO"; excerpt from the deposition of Mark Hergesheimer deposition of November 17, 2009, 40: 25, 41: 1-15). On the way to the Orange County Jail, Mr. Radwan was scared that he would continue to be tortured by the deputies inside the jail and implored to Deputy Hergesheimer that he would not be a problem and would cooperate with the deputies inside the jail (See JOSHUA DECL ¶ 71). Notwithstanding Mr. Radwan's pleas to Deputy Hergesheimer, Deputy Hergesheimer announced over the jail public announcement system that there was an uncooperative inmate in the sally port and numerous Orange County Sheriff's deputies came out to the sally port to assist in taking Mr. Radwan inside the jail (See Exhibit "PPP"; excerpt from the deposition of Michael Padilla of November 19, 2009, 33: 8-11, see also Exhibit "QQQ"; excerpt from the deposition of Cyril Foster of November 18, 2009, 30: 22-25, 31: 1-2, JOSHUA DECL ¶ 72).

Mr. Radwan was already placed in ankle cuffs/leg irons when he arrived at the sally port. The leg irons were placed on Mr. Radwan prior to entering Deputy Hergesheimer's patrol vehicle on the field. (See JOSHUA DECL ¶ 46). Mr. Radwan was continuously complaining to Deputy Hergesheimer that his ankles were too tight while they were enroute to the Orange County Jail as well as to the other deputies while at the sally port (See JOSHUA DECL ¶ 71). There was no reason to put the leg irons on Mr. Radwan or continue to keep the leg irons on Mr. Radwan, other than to torture him.

Notwithstanding the fact that Mr.

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

53

Radwan was being compliant, the Orange County Deputies refused to take off or even loosen Mr. Radwan's leg irons (See Exhibit "RRR"; excerpt from the deposition of Cyril Foster of November 18, 2009, 48: 9-15).  The defendant deputies allege that Mr. Radwan was uncooperative and showing bizarre behavior while at the sally port, however, the only behavior that Mr. Radwan was exhibiting was that of someone who was in excruciating pain (See Exhibit "RRR"; excerpt from the deposition of Cyril Foster of November 18, 2009, 48: 9-15, see also Exhibit "SSS"; excerpt from the deposition of Michael Padilla of November 19, 2009, 33: 8-11, Exhibit "R"; at Windows Media Player Counter 47:24).

It is the policy of the Orange County Sheriff's Department not to uncuff a prisoner until the inmate has reached the "uncuff area" regardless of their level of cooperativeness (See Exhibit "TTT"; excerpt from the deposition of Michael Padilla of November 19, 2009, 50: 9-21). The deputies could have uncuffed the leg irons, or at the very least loosen them, while in the sally port without risking deputy safety because Mr. Radwan would still be wearing handcuffs.

Even though the defendant deputies acknowledged that they heard Mr. Radwan "making noises" and complaining about his ankles being too tight, they continued to torture Mr. Radwan by making him go through the entire booking process while wearing his leg irons (See Exhibit "TTT"; excerpt from the deposition of Michael Padilla of November 19, 2009, 50: 9-21, see also Exhibit "UUU"; excerpt from the deposition of Michael Padilla of November

19, 2009, 47: 1-18).   In their depositions, the defendant deputies acknowledged that Mr. Radwan was, "making noises" during the booking process and out at the sally port, but refused to acknowledge that the noises that he was making were indicative of someone experiencing pain (See Exhibit "VVV"; excerpt from the deposition of Michael Padilla of November 19, 2009, 41: 8-9, Exhibit "WWW"; excerpt from the deposition of Cyril Foster of November 18, 2009, 45:14 – 46:10).

While the deputies were trying to get Mr. Radwan inside the jail, Mr. Radwan could barely walk due to the excruciating pain the leg irons were causing him, the deputies picked Mr. Radwan up by the shoulders and by the legs and carried him inside jail (See JOSHUA DECL ¶ 88).

Once Mr. Radwan was taken inside the Intake Release Center at the Orange County Jail, he was taken to the triage window where he received a medical interview.  During plaintiff's medical interview at the Jail Triage Counter, defendant Padilla was standing and stepping on plaintiff's leg irons chain; causing plaintiff to suffer great pain, for no legitimate reason. Plaintiff complained to Deputy Padilla about his breaking his ankle and stepping on his leg iron chain, but for whatever reason, he continued to torture plaintiff by stepping on his leg iron chains for approximately three minutes. See, Exhibit "G"; Windows Media Player Counter 08:13 – 11:15; See also, JOSHUA DECL ¶ 89).

After his medical interview Mr. Radwan was carried by the defendants to a medical observation cell.  During Mr.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Radwan being carried from the Triage area to the Medical Observation Cell, he was again crying out in great pain. Defendants Padilla, Foster and Garcia (and later deputy Streeter) hurt Mr. Radwan badly, by carrying Mr. Radwan by his upper arms and his leg iron chain. Exhibit "G"; Windows Media Player Counter 11:24 – 12:12. Mr. Radwan felt like his arms were being ripped out or off, and Mr. Radwan's chest, back and shoulders were in severe pain.  Mr. Radwan was inside of the jail. There was no reason to do this to Mr. Radwan, other than to torture him (See also, JOSHUA DECL ¶ 94).

Once Mr. Radwan was in the Medical Observation Cell, Mr. Radwan was smothered by the body weight of deputies, and tortured by their wrist locks and literal twisting of Mr. Radwan arms. Mr. Radwan begged for mercy, for the deputies to stop torturing him. Exhibit "G"; Windows Media Player Counter 13:05(See, JOSHUA DECL ¶ 95).  Defendant Padilla held onto Mr. Radwan's right arm and was holding it and bending it in a very painful way (See, JOSHUA DECL ¶ 96-97).

Defendant Hernandez pinned Mr. Radwan's left leg down, bending it onto Mr. Radwan's rear end area with his body weight; causing Mr. Radwan to suffer great pain and agony.  Deputy Streeter pinned Mr. Radwan's right leg down, bending it onto Mr. Radwan's rear end area with his body weight; causing Mr. Radwan to suffer great pain and agony.

After Mr. Radwan's pants were removed, deputies Streeter and Hernandez put Mr. Radwan into a "figure four"; again bending Mr. Radwan's legs down over Mr.

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE
56

Radwan's rear end area, and pressing down with their body weight; for no other reason than to torture Mr. Radwan. Exhibit "G"; Windows Media Player Counter 13:56, See also, JOSHUA DECL ¶ 98-99).

Defendants Foster and Padilla kept on twisting Mr. Radwan's arms, causing Mr. Radwan to suffer great pain; especially to Mr. Radwan's shoulders, until finally, deputy Padilla twisted Mr. Radwan's right arm so severely, that he dislocated it out of Mr. Radwan's right arm socket. One can actually hear it crack when he bent it all the way over. Exhibit "G"; Windows Media Player Counter 14:33. This caused Mr. Radwan to suffer incredible pain. Even to this day, Mr. Radwan's right shoulder remains dislocated, and often pops out of his right arm socket.  Notwithstanding Mr. Radwan screaming out in agony, none of the deputies would stop torturing Mr. Radwan (See also, JOSHUA DECL ¶ 100-102).

After watching Mr. Radwan being carried by his shoulders and tortured in the medical observation cell, defendant Deputy Foster states in his deposition that he has no idea how Mr. Radwan's shoulder could have been dislocated (See, Exhibit "XXX"; excerpt from the deposition of Cyril Foster of November 18, 2009, 74: 13-23).

After watching the hand held and fixed mounted video of Mr. Radwan at the Orange County Jail, defendants Deputy Padilla and Deputy Foster both say that there is nothing in the video which shows anything outside the practice or customs of the Orange County Sheriff's Department in 2006 or 2007 (See Exhibit "YYY"; excerpt from the Deposition of Michael Padilla of

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

57

November 19, 2009, 101: 4-15, See also
Exhibit "ZZZ"; excerpt from the Deposition
of Cyril Foster of November 18, 2009, 76:
15-24).

Defendants Deputy Padilla and
Deputy Hernandez have used similar torture
techniques on previous inmates, showing a
custom and practice of the Orange County
Sheriff's Department to use excessive or
unreasonable force at the Orange County
Jail as well as showing that the Orange
County Sheriff's Department has not
sufficiently trained their deputies.

In a previous case involving
Defendants Deputy Padilla and Deputy
Hernandez, the deputies tortured inmate
Gabriel Celli using the same figure four
technique that was used on Mr. Radwan
(*Nancy Turner And Gabriel Celli v. County
Of Orange, et al.*, SACV 06-492-JVS
(RNBx). Mr. Celli, like Mr. Radwan, was
cooperating with the deputies during the
entire booking process, but was
nonetheless, subjected to physical torture
inside the cell while being uncuffed (See,
Exhibit "AAAA"; copy of the hand held
video recording and fix mounted camera
recording at the Orange County Jail on
January 1, 2006, See also, Exhibit "BBBB";
Declaration of Gabriel Celli, ¶ 31-36).

Deputy Hernandez wrote a Jail
Incident Report regarding Mr. Celli in
which Deputy Hernandez justifies
subjecting Mr. Celli to such treatment by
stating that Mr. Celli was being
uncooperative. However, the video from
the Orange County Jail clearly shows Mr.
Celli cooperating with the deputies during
every phase of the booking process (See,
Exhibit "AAAA"; Mixed fixed video

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

monitoring and hand held video of January, 2006 of plaintiff at the Orange County Jail, Intake Release Facility, See also Exhibit "EEEE"; Orange County Sheriff's Department Jail Incident Report of Deputy David Hernandez of January 1, 2006, See also Exhibit "BBBB"; Declaration of Gabriel Celli, ¶ 31-36).

Mr. Celli was placed in the same figure four prone position that was used to torture Mr. Radwan, showing a custom and practice of using unreasonable and excessive force at the Orange County Jail (See, Exhibit "LLL"; Hand held video of January 1, 2006 of plaintiff at the Orange County Jail, Intake Release Facility; Windows Media Player Counter 00:29). Coincidentally, in Mr. Celli's case, Deputy Michael Padilla tortured Mr. Celli in the jail and Deputy David Hernandez authored the Jail Incident Report.  In Mr. Radwan's case, Deputy Michael Hernandez tortured Mr. Radwan and Deputy Michael Padilla authored the Jail Incident Report.

Orange County Sheriff's Department's "Person Most Knowledgeable" person on use of force, Deputy Luke Krueger stated in his deposition that the he had never seen deputies "de-escalate" a situation better than what the deputies did with Mr. Celli and that their actions were "textbook" (See Exhibit "CCCC"; excerpt from the deposition of Luke Krueger of November 3, 2009, 105: 14-25, 106: 1-18).  In that same deposition, Deputy Krueger stated that the tackling of Mr. Celli and his elderly mother, Nancy Turner, of January 1, 2006 by Orange County Sheriff's Department Deputy Sheriff Jason Perez was,

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

"textbook", notwithstanding the fact that Mr. Celli and his mother were merely hugging each other while standing on their driveway (See Exhibit "DDDD"; excerpt from the deposition of Luke Krueger of November 3, 2009, 78: 23-25, 79: 1-16, See also, Exhibit "BBBB"; Declaration of Gabriel Celli, ¶ 14-16). See also, Separately Filed Exhibit "AAAAA"; DVD of Patrol Video System video recording of Orange County Sheriff's Department Deputy Sheriff Jason Perez. Notwithstanding the obvious wrongful and unlawfulness of Deputy Perez' tacking of a then 57 year old woman with a cast on her broken arm who was merely hugging her son in a neighbors driveway, because she had witnessed the brutal New Year's Eve beating of a neighbor by Orange County Sheriff's Department Deputy Sheriff's Isaac Felter, the Orange County Sheriff's Department exonerated Deputy Perez. See, Separately Filed Exhibit "BBBBB"; "Crime Summary Information, Probable Cause Declaration, Bail Setting Information" form of Orange County Sheriff's Department Deputy Sheriff Jason Perez of January 1, 2006.

A number of other individuals have complained of similar treatment at the Orange County Jail by the Orange County Sheriff's Department personnel (See Exhibit "JJJJ"; Declaration of Steven Huntsaker, See also, Exhibit "KKKK"; Declaration of Allen Pittman, See also, Exhibit "LLLL"; Declaration of Stephen Conlon, See also, Exhibit "MMMM"; Declaration of Sarah Jensen, See also, Exhibit "NNNN"; Declaration of Thomas Benhoff, See also, Exhibit "OOOO"; Declaration of Timothy Gregart).

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE
60

On September 3, 2004, deputies at the Orange County Sheriff's Department brutally tased and tortured Liza Munoz at the Orange County Jail (*Liza Danielle Munoz V. County Of Orange, et al*, Case No. CV 04-09589 AHM (VBKx)). The deputies at the Orange County Jail brutally tortured and tased Ms. Munoz even though Ms. Munoz was following all of the deputies' instructions (See Exhibit "MMM"; hand held video of Liza Munoz at the Orange County Jail on September 3, 2004, See also, Exhibit "PPPP"; Declaration of Liza Danielle Munoz; Signed copy is filed with the District Court as Item Number 51, Case No. CV 04-09589 AHM(VBKx), Dated September 20, 2007.

In another incident, an arrestee who was brought into the Orange County Jail was repeatedly tased while he was handcuffed and was beaten-up at the Orange County Jail on March 18, 2006, as shown in Exhibit "KKKKK", attached to the declaration of attorney Brian Carlin filed by plaintiff in opposition to defendants' motions for summary judgment / summary adjudication.

187. The Orange County Sheriff's Department does not have, and did not have on December 23-24, 2006, a policy, custom or practice allowing its officers to conduct unlawful or unconstitutional searches. To the contrary, it was and still is the policy of the Orange County Sheriff's Department for its officers to conduct only lawful and constitutional searches based upon probable cause and pursuant to a warrant unless an exception to

187. **Disputed.** Before The United States Supreme Court issued their ruling in *Arizona v. Gant*, 556 U.S. __ (2009) on April 21, 2009, the Orange County Sheriff's Department was conducting searches pursuant to the standards set forth in *New York v. Belton*, 453 U.S. 454 (1981). Defendant Deputy Prince states in his deposition, "I began to search the front passenger compartment of Radwan's Range Rover for further contraband, such as marijuana (See Exhibit "FFFF"; Declaration of Matthew Prince). Defendant

| | |
|---|---|
| the warrant requirement applies to the circumstances. | Deputy Kunar states in his declaration, "I then briefly assisted Deputy Hilliard search the back cargo area of Radwan's Range Rover (See Exhibit "GGGG"; Declaration of Mark Kunar). |
| 188. Both before and after December 23-24, 2006, the Orange County Sheriff's Department has had specific policies and procedures, and implemented training and disciplinary measures, to prevent the various types of misconduct (such as framing of innocent persons, covering up misconduct, and excessive force) that Plaintiff Radwan alleges occurred.  The Orange County Sheriff's Department does not authorize or condones any such acts of misconduct. | 188. **Disputed**.  All Orange County Sheriff's Department Sheriff's Deputies must audio record, *inter alia*, pursuits/failure to yield, car stops, arrests, DUI observations and field balance and coordination tests, traffic enforcement and pedestrian stops and all calls for service (See attached Exhibit "V"; Orange County Sheriff's Department Operating Procedures Manual Section 61.3; previously updated on July 20, 2006.  See also attached Exhibit "BB"; Orange County Sheriff's Department Operating Procedures Manual Section 61.2-61.3; previously updated in May of 2000. See also attached Exhibit "CC"; Orange County Sheriff's Department Training Guide – Patrol Video System pg. 5-6). Notwithstanding the Orange County Sheriff's Department's clear directive to use the department issued audio recording microphone when engaged in the situations listed above, defendant James Fouste made a decision not to audio record his interactions with plaintiff Joshua Radwan on December 23, 2006 (See Exhibit "C"; copy of defendant James Fouste's patrol video system tape on December 23, 2006). In a deposition for this litigation, defendant Fouste admits that he was called to the Radwan incident for a "call for service" and did not audio record any part of the incident involving Mr. Radwan and himself (See Exhibit "DD"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, |

53: 17-19, see also Exhibit "EE"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, 57: 8-12). Defendant Fouste states that he did not record his encounter with Mr. Radwan because his microphone was not functioning that day (See Exhibit "FF"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, 112: 1-6).

According to the Orange County Sheriff's Department Operations Procedure Manual Section 61.3, if a deputy's patrol video system is not functioning properly, and no other units are available, the deputy shall notify his/her supervisor prior to going in service. Both the deputy and the supervisor will make note of the date and time of notification on their logs and a maintenance request form must be completed prior to going in service, or upon the completion of the shift if the patrol video system malfunctioned during the shift (See attached Exhibit "BB"; Orange County Sheriff's Department Operating Procedures Manual Section 61.3; previously updated on July 20, 2006. See also attached Exhibit "BB"; Orange County Sheriff's Department Operating Procedures Manual Section 61.2-61.2; previously updated in May of 2000).

Although Defendant Fouste testified at his deposition that he did not audio record his encounter with Mr. Radwan because his microphone was not functioning, Defendant Fouste's patrol video system tape for that date, shows that defendant Fouste turned on his microphone minutes after he left the scene of the Radwan arrest (See Exhibit "FF"; excerpt

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

from defendant Orange County Sheriff's
Sergeant James Fouste's deposition of
December 31, 2009, 112: 1-6, see also
Exhibit "C"; copy of defendant James
Fouste's patrol video system tape on
December 23, 2006, Windows Media
Player time 02:46:57).  This shows that
Defendant Fouste's microphone was
working and deliberately did not record his
encounter with Mr. Radwan.

Sergeant Timothy Rainwater, a
sergeant with the Orange County Sheriff's
Department testified in his deposition that
sergeants at the Orange County Sheriff's
Department are required to author a patrol
sergeant's activity report for each duty shift
that they work as a sergeant (See attached
Exhibit "FFFFF"; excerpt of the deposition
of defendant Timothy Lee Rainwater of
October 7, 2009; p. 8:1-22; also see Exhibit
"GG"; excerpt of the deposition of Timothy
Rainwater of October 7, 2009 12: 22-25,
13: 1-2).  Orange County Sheriff's Sergeant
John Smiertelny testified in a deposition
that Orange County Sheriff's deputies must
notify their sergeant if there is a problem
with their patrol video system, and the
sergeant will make a note of it in their
patrol sergeant's daily activity report (See
attached Exhibit "GGGGG"; excerpt of the
deposition of defendant John Smiertelny of
August 27, 2002; p. 4:11-25; also see
Exhibit "HH"; excerpt of the deposition of
John Smiertelny of August 27, 2002, 29: 7-
22).   Orange County Sheriff's Department
Lieutenant Jeffrey Bardzik testified in a
deposition that Orange County Sheriff's
Department Sergeants are always required
to fill out a daily activity report for their
shift (See attached Exhibit "II"; excerpt of

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE
64

the deposition of Jeffrey Bardzik of May 2, 2002, 117: 9-12); also see Exhibit "IIIII"; excerpt of the deposition of defendant David Bardzik of May 2, 2007; pp. 7:6-10:10.

Then Orange County Sheriff's Department Captain, and former acting Orange County Sheriff, Jack Anderson, testified in a deposition that a patrol sergeant's activity report is a form that supervisors fill out which gives highlights of the shift and that Orange County Sheriff's Sergeants are required to author a patrol sergeant's activity report for each and every shift that they work (See attached Exhibit "HHHHH"; excerpt of the deposition of defendant Jack Joseph Anderson of January 19, 2007; pp. 9:11-11:11; also see Exhibit "JJ"; excerpt of the deposition of Jack Anderson of January 19, 2007, 57: 4-15). Furthermore, patrol sergeant's activity reports are all stored together at the Orange County Sheriff's Department in boxes (See Exhibit "IIIII"; Picture of storage box for Orange County Sheriff's Department patrol sergeant's activity reports).

Defendant Fouste stated in his deposition that he did not author a patrol sergeant's activity report that began on December 23, 2006 and ended on December 24, 2006 because there was no significant activity that occurred that evening (See Exhibit "KK"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, 16: 13-20). However, sergeant's at the Orange County Sheriff's Department still author a patrol sergeant's activity report if there was no significant

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

activity that occurred on that day. The sergeant's, however, still author a report and write that, "there was no significant activity (See Exhibit "HHHH"; Orange County Sheriff's Department patrol sergeant's activity report).

Captain Anderson then went on to testify in his deposition that the Orange County Sheriff's Department Operation Procedure Manual requires that if a patrol video system is inoperable, the deputy must report that to their sergeant. The sergeant must then record that information in his patrol sergeant's activity report to ensure that a repair form has been submitted for fixing that equipment (See attached Exhibit "LL"; excerpt of the deposition of Jack Anderson of January 19, 2007, 58: 11-21).

None of the deputies present at the Radwan incident audio recorded their encounter with Mr. Radwan. Orange County Sheriff's Department Deputy Mark Hergesheimer was present at the incident regarding Mr. Radwan and did not audio record his encounter with Mr. Radwan (See Exhibit "MM"; excerpt of the deposition of Mark Hergesheimer of November 17, 2009, 47: 20-25). Orange County Sheriff's Department Deputy Sean Hilliard was present at the incident regarding Mr. Radwan and did not audio record his encounter with Mr. Radwan (See Exhibit "NN"; excerpt of the deposition of Sean Hilliard of December 16, 2009, 40: 10-25 ). Orange County Sheriff's Department Deputy Mark Kunar was present at the incident regarding Mr. Radwan and did not audio record his encounter with Mr. Radwan (See Exhibit "OO"; excerpt of the deposition of Mark Kunar of November 17,

2009, 56: 24-25, 57: 1-5).   Orange County Sheriff's Department Deputy Matthew Prince was present at the incident regarding Mr. Radwan and his patrol video system tape of the incident does not contain any audio (See Exhibit "PP"; excerpt of the deposition of Matthew Prince of February 22, 2010, 121: 1-6).

Defendant Fouste, was the supervisor for the deputies named above (See Exhibit "QQ"; excerpt from the deposition of Matthew Prince of November 24, 2009, 13: 2-5).  As shown above, none of the deputies who encountered Mr. Radwan on the field recorded their encounter with Mr. Radwan. Since this was a "call for service" all of the deputies should have recorded their encounter with Mr. Radwan, but none of them did.  If, their microphones were malfunctioning, the deputies should have informed Sergeant Fouste and Sergeant Fouste should have noted the malfunction in his patrol sergeant's activity report. However, not only did Sergeant Fouste not mention any malfunctions with the deputies' microphones, Sergeant Fouste did not author a sergeant's patrol activity report at all.

Defendant Sergeant Fouste has shown a pattern of picking and choosing when he will follow the clear instructions of the Orange County Sheriff's Department to audio record certain situations.  Defendant Sergeant Fouste was a defendant in a case in 2001 involving then plaintiff, Cory Baima (*CORY BAIMA v. COUNTY OF ORANGE, GEORGE KLUCHONIC, JAMES FOUSTE, MONTE HUOTARI, DAVID and Does 1 through 10, inclusive*; SACV-01-710 DOC (ANx).  That case

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

involved Sergeant Fouste, then Deputy Fouste, falsely arresting and using unreasonable force on plaintiff Cory Baima. Defendant Fouste had his microphone on during most of his encounter with Mr. Baima. However, after torturing Mr. Baima, Defendant Fouste realized that he forgot to turn his microphone off during the torturing of Mr. Baima and quickly turned his microphone off (See Exhibit "D"; copy of defendant James Fouste's patrol video system tape on February 13, 2001, Windows Media Player time 05:04). Defendant Fouste identified himself in the video during his deposition for this litigation (See Exhibit "RR"; excerpt from defendant Orange County Sheriff's Sergeant James Fouste's deposition of December 31, 2009, 117: 16-25, 118: 1-11). Realizing that he had just audio recorded himself torturing Mr. Baima, Defendant Sergeant Fouste stated, "I think my mic's on" and quickly turns off his microphone (See Exhibit "D"; copy of defendant James Fouste's patrol video system tape on February 13, 2001, Windows Media Player time 05:05. See also Exhibit "SS"; Transcript of a Conversation between Defendant Deputy Fouste and Baima, February 13, 2001, pg.5).

Defendant Fouste's pattern of dishonesty was further shown when he authored a report for the incident involving Mr. Baima. Defendant Fouste stated in his report that, "Baima attempted to pull away from Kluchonic and resisted his efforts to handcuff him . . . . Even though Baima was handcuffed, we were unable to safely search him because he was still being uncooperative." Defendant Fouste also

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE
68

states in his report that Mr. Baima was refusing to put his hands up when instructed to do so (See Exhibit "TT"; copy of Orange County Sheriff's Department Deputy Fouste's Initial Crime Report, Case No. 01-0031144).

Defendant Fouste's patrol video system tape clearly shows that none of the statements in Defendant Fouste's report were true. Mr. Baima put his hands up immediately after Defendant Fouste instructed him to do so. Mr. Baima can be seen on the video complying with every command that Defendant Fouste gave (See Exhibit "D"; copy of defendant James Fouste's patrol video system tape on February 13, 2001).

Defendant Fouste's behavior showed a disregard for the Orange County Sheriff's Department's policies did not end at turning off his microphone during the torturing of Mr. Baima or lying in his report; Defendant Fouste attempted to destroy the audio and video recordings of him torturing Mr. Baima.

According to Orange County Sheriff's Department Investigator Mike Shultz's report, Deputy George Kluchonic assisted Defendant Fouste with arresting Mr. Baima. Instead of taking his patrol video system recording to "the cage" at the Aliso Viejo Station at the end of his shift, Defendant Fouste placed his patrol video system tape in Deputy Kluchonic's station mailbox. Deputy Kluchonic then took Defendant Fouste's patrol video system tape to Community Services Officer Michael Foster and said, "Make sure this get thoroughly erased." CSO Foster did not destroy the tape and courageously reported

| | |
|---|---|
| | this misconduct to his supervisors (See attached Exhibit "UU"; copy of Orange County Sheriff's Department Investigator Mike Schultz's Follow Up Report dated March 6, 2001).<br><br>      Following the incident with Baima involving torture, lying in reports and attempting to destroy evidence, the Orange County Sheriff's Department promoted Defendant Fouste to sergeant (See Exhibit "VV" an excerpt from the deposition of James Fouste of January 3, 2004, 9: 14-15). The fact that a man like Defendant Fouste was promoted to sergeant is in and of itself proof that the Orange County Sheriff's Department has a custom or practice of using excessive and unreasonable force. |
| 189. Deputy Jarrett Kurimay was not present at the Paseo De Colinas Incident. | 189.  Undisputed. |
| 190. Plaintiff eventually pled guilty to, and was convicted for, his possession of marijuana in this case. | 190.  **Disputed in part. Although plaintiff did plead guilty to possession to less than one ounce of marijuana on January 18, 2008, the Orange County Superior Court permitted plaintiff to withdraw his guilty plea and dismissed that misdemeanor action, *in toto*, on May 6, 2010. Accordingly, plaintiff does not have a conviction for possession of marijuana. See, the Certified Copy of the criminal case docket report in Orange County Superior Court Case Number 07SM00978; p. 6 of 6; Exhibit "JJJJJ" attached to the declaration of Jerry L. Steering re: authentication of exhibits in opposition to defendants'** |

Dated: May 13, 2010

_____

JERRY L. STEERING

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

70

## PROOF OF SERVICE

I declare that I am employed in the County of Orange, State of California. I am over the age of eighteen years and not a party to the within cause; my business address is 4063 Birch Street, Suite 100, Newport Beach, California 92660.

On May 14, 2010, I served the attached:

PLAINTIFF'S AMENDED STATEMENT OF GENUINE MATERIAL ISSUES OF FACTS IN DISPUTE IN OPPOSITION TO DEFENDANT COUNTY OF ORANGE'S MOTION FOR SUMMARY JUDGMENT / SUMMARY ADJUDICATION OF ISSUES

On the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Daniel Cha, Esq.
Lawrence, Beach, Allen and Choi, PC
1600 North Broadway
Suite 1010
Santa Ana, CA 92706

( X ) BY E-MAIL   (via e-filing)

(  ) BY PERSONAL SERVICE

( X ) BY MAIL I placed each sealed envelope with postage there prepaid, for collection and mailing at Newport Beach, California, following ordinary business practices. I am readily familiar with the practice that in the ordinary course of business, correspondence is deposited in the United Stated Postal Service the same day as it is placed for processing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This the 14th day of May, 2010, at Newport Beach, California.

Belinda Hernandez

AMENEDED STATEMENT OF MATERIALFACTS IN DISPUTE

71